**NCNB TEXAS NATIONAL BANK, et al., Plaintiffs–Appellees,**

v.

**Candice Beth COWDEN and Billi Terresa Cowden, Defendants–Appellants.**

No. 89–1439.

United States Court of Appeals, Fifth Circuit.

Feb. 26, 1990.

Marc L. Skeen, Stubbeman, McRae, Sealy, Laughlin & Browder, Inc., Midland, Tex., for defendants-appellants.

Paul R. Aiello, Baker & Botts, Michael L. Graham, Dallas, Tex., Stanley M. Johanson, Vinson & Elkins, Austin, Tex., Stephen Gillham Tipps, Baker & Botts, Houston, Tex., for NCNB Texas Nat. Bank.

William Franklin Carroll, John M. Nevins, Mark J. Zimmermann, Bruce L. Collins, III, Baker, Mills & Glast, R.J. Hobby, Dallas, Tex., for Federal Deposit Ins. Corp., et al.

Before REAVLEY, SMITH and DUHÉ, Circuit Judges.

REAVLEY, Circuit Judge:

In this case we must determine whether the Federal Deposit Insurance Corporation (FDIC), in its capacity as receiver of an insolvent banking institution, had authority in 1988[1] to transfer the fiduciary appointments held by the insolvent bank to a federally created bridge bank. The district court ruled that federal law authorized FDIC to make such a transfer and that, to the extent it conflicted with FDIC's authority, Texas law relating to transfer of fiduciary appointments was pre-empted. We affirm.

## I.

On July 29, 1988, the Office of the Comptroller of the Currency (OCC) and the Texas Banking Commissioner declared the forty national and state banks in Texas that were directly or indirectly owned by First RepublicBank Corporation (FRBC) insolvent and appointed FDIC to act as receiver of each of these institutions. In its capacity as receiver, FDIC on the same day entered into forty purchase and assumption agreements with JRB Bank, National Association ("JRB Bank"), a bridge bank chartered by FDIC pursuant to 12 U.S.C. section 1821(i) (current version at 12 U.S.C. section 1821(n)).[2] These agreements required FDIC to transfer certain deposits, assets, liabilities, and obligations of the closed banks to JRB Bank. Also on July 29, 1988, the Federal Reserve Board approved the application of NCNB Corporation, a bank holding company, to acquire control of JRB Bank, and JRB Bank was renamed NCNB Texas National Bank ("NCNB Texas").[3] The record does not

1. As explained below 12 U.S.C. § 1821(n) as enacted by the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 made explicit what the statute in 1988 implicitly authorized.

2. The Board of Directors of FDIC previously had determined that continued operation of the FRBC institutions was essential to maintain adequate banking services in the communities where the banks were located and was in the best interest of the banks' depositors and the public. In accordance with these findings, FDIC, on July 27, 1988, had chartered JRB Bank so that it could take over the operations of the FRBC institutions. *See* Agreed Statement of

Facts at 2–3, *NCNB Texas Nat'l Bank v. Cowden,* 712 F.Supp. 1249 (W.D.Tex.1989) (No. MO–88–CA–301) [hereinafter "Agreed Statement of Facts"].

3. Recognizing the possibility that one or more of the FRBC institutions would fail, FDIC began soliciting acquisition proposals several weeks prior to the insolvency declarations. NCNB Corporation submitted the winning proposal. As was contemplated by this proposal, NCNB Texas Bancorporation, Inc., a subsidiary of NCNB Corporation, made a $210 million equity investment in the bridge bank and acquired all two million shares of common stock with voting rights, representing a twenty percent ownership

reflect whether NCNB Texas is a continuation of the bridge bank under a different name or a new banking entity that took over JRB Bank following its short existence. The parties have treated NCNB Texas as a continuation of the bridge bank, and our analysis is based on that understanding. Although we refer to both JRB Bank and NCNB Texas, for all important purposes they are one entity and enjoy equivalent rights.

First RepublicBank Midland ("FRB–Midland") was one of the banks affected by the insolvency declarations. At the close of business on July 29, 1988, FRB–Midland was serving as executor or administrator of approximately eighteen estates and as trustee of over nine hundred trusts created by various trust instruments.[4] One set of obligations FDIC sought to transfer to NCNB Texas through the transactions described above was these fiduciary appointments previously held by FRB–Midland. Section 4.7 of the purchase and assumption agreement relating to FRB–Midland ("P & A Agreement") provided:

> *Agreement With Respect to Trust Business.* The trust business of the Failed Bank [FRB–Midland] is hereby transferred to the Assuming Bank [JRB Bank] effective as of Bank Closing.
>
> (a) The Assuming Bank shall, without further transfer, substitution, act or deed, to the full extent permitted by law, succeed to the rights, obligations, properties, assets, investments, deposits, agreements and trusts of the Failed Bank under (i) trusts, executorships, administrations, guardianships, agencies and (ii) other fiduciary or representative capacities, all to the same extent as though the Assuming Bank had originally assumed the same; provided, that any liability based on the malfeasance or nonfeasance of the Failed Bank, its directors, officers, employees or agents with respect to the trust business of the Bank is not assumed hereunder.

> (b) The Assuming Bank shall, to the full extent permitted by law, succeed to, and shall be entitled to take and execute, the appointment to all executorships, trusteeships, guardianships and other fiduciary or representative capacities to which the Failed Bank is or may be named in wills, whenever probated, or to which the Failed Bank is or may be named or appointed by any other instrument.
>
> (c) In the event additional proceedings of any kind are necessary to accomplish the transfer of such trust business (including the appointment by any court of the Assuming Bank as successor to the Failed Bank in any fiduciary or representative capacities), the Assuming Bank, at its own expense, agrees that it will take whatever action is necessary to accomplish such transfer. The Receiver agrees to use its reasonable best efforts to assist the Assuming Bank in accomplishing such transfer.

OCC approved the terms of the P & A Agreement. FDIC, acting as receiver, also sought and obtained an order approving the transaction from the United States District Court for the Western District of Texas. *See In re Receivership of First RepublicBank Midland,* No. 7–88–173, slip op. (W.D.Tex. July 29, 1988). That order provided in part that "the Assuming Bank be and hereby is, appointed as successor to all rights, obligations, assets, deposits, agreements and trusts held by the Bank as trustee, or in any other fiduciary or representative capacities, as provided in the Purchase and Assumption Agreement." *Id.* at 4. Thus, to the extent FDIC had authority to transfer fiduciary appointments, NCNB Texas succeeded to the fiduciary positions previously held by FRB–Midland.

Up until the time it was declared insolvent, FRB–Midland had been serving as the independent executor of the Estate of Billy Tom Cowden ("B.T. Cowden Estate"), which was being administered in accord-

---

interest in the bridge bank. NCNB Texas Bancorporation obtained the right to acquire the remaining ownership interest during the succeeding five years. *See* Agreed Statement of Facts, *supra,* at 6–7.

4. The assets of these estates and trusts were valued at approximately $430 million.

ance with the Last Will and Testament of Billy Tom Cowden ("B.T. Cowden Will"). FRB–Midland also was serving as trustee of the following trusts:

1. B.T. Cowden Trust. Pursuant to the Beneficiaries Agreement dated May 16, 1975, this trust was divided into two trust accounts.

    a. Trust No. 1251 for the benefit of Candice Beth Cowden. Under the terms of the Trust Agreement, Candice became eligible to withdraw the entire principal from this trust on March 30, 1987.

    b. Trust No. 1252 for the benefit of Billi Terresa Cowden. Under the terms of the Trust Agreement, Billi became eligible to withdraw the entire principal from this trust on November 30, 1988.

2. Candice Beth Cowden Trust, Trust No. 1090. The Trust Agreement provided that Candice could terminate the trust in whole or in part at any time.

3. Billi Terresa Cowden Trust, Trust No. 1244. The Trust Agreement provided that Billi could terminate the trust in whole or in part at any time.

4. Testamentary Trust created by the B.T. Cowden Will and funded by the residuary estate of Billy Tom Cowden.

The instruments creating the trusts did not provide for replacement of a trustee that becomes insolvent. Each trust instrument, however, established a procedure through which a trustee could resign and a successor trustee could be appointed. The B.T. Cowden Will did not provide for the selection of an alternate or successor independent executor.

On June 7, 1988, Candice had executed instruments purporting to withdraw the principal balance from Trust No. 1251 and to terminate Trust No. 1090. On June 15, 1988, Billi had executed an instrument purporting to terminate Trust No. 1244. FRB–Midland had made no distributions of the assets subject to these trusts prior to being declared insolvent. NCNB Texas subsequently offered to make the requested distributions, including transfer by warranty deed of all real property. The Cow-

dens, however, denied the validity of NCNB Texas' succession to the FRB–Midland fiduciary appointments and thus challenged its authority to make the distributions. By letter dated November 2, 1988, counsel for the Cowdens asserted that NCNB Texas had "not been appointed a successor fiduciary by any Court of competent jurisdiction" and that it could not "be a successor fiduciary without such an appointment." By letter dated November 30, 1988, counsel for the Cowdens, after reviewing "general principles of Texas law as to the personal nature of the position of trustee" and "the nature of the proceedings pursuant to which" FRB–Midland's fiduciary responsibilities were transferred to NCNB Texas, preliminarily concluded "that NCNB … is not automatically the trustee of all trusts wherein a First RepublicBank institution had previously served as trustee, but that such may be true where there is special wording accomplishing that result in a particular trust instrument."

On November 30, 1988, NCNB Texas and FDIC brought this action in the United States District Court for the Western District of Texas seeking a judgment declaring that NCNB Texas was the valid successor to FRB–Midland's fiduciary appointments and enjoining the Cowdens from taking any action challenging NCNB Texas' exercise of its responsibilities pursuant to those appointments. The complaint alleged that the transfer of FRB–Midland's fiduciary appointments to NCNB Texas was authorized by federal banking laws and federal common law, which pre-empted any conflicting Texas estate and trust laws regulating the transfer of such appointments. In their Answer and Counterclaim, the Cowdens alleged that "FDIC Receiver was [not] empowered to effect a transfer of the fiduciary appointments held by First RepublicBank Midland incident to the Cowden Trusts" and that NCNB Texas could not "convey them good and marketable title to their trust assets." The parties submitted an Agreed Statement of Facts and each moved for summary judgment.

The district court ruled in favor of NCNB Texas and FDIC, declaring NCNB

Texas the successor trustee to the Cowden trusts.[5] *See NCNB Texas Nat'l Bank v. Cowden,* 712 F.Supp. 1249, 1257 (W.D.Tex. 1989). The court based its judgment on two alternate grounds. First, the court noted that in *First National Bank v. Federal Deposit Insurance Corp.,* 707 F.Supp. 265 (W.D.Tex.1989), it had determined that, as a matter of Texas law, when the Texas Banking Commissioner appoints FDIC to act as receiver of a failed state bank FDIC has authority to transfer the failed bank's fiduciary appointments to a successor institution. The court held that "it would be anomalous to conclude that the demise of [a] nationally chartered banking institution did not permit a similar transfer of the fiduciary powers to a successor institution." *NCNB Texas Nat'l Bank,* 712 F.Supp. at 1253. Second, the court held that any Texas laws limiting FDIC's authority to transfer the fiduciary obligations of an insolvent bank were pre-empted. The court observed that "the United States Congress possesses the power to provide for the uninterrupted continuation of all banking activities of a failed bank and did so in enacting the statutory framework at bar." *Id.* In reaching its conclusion, the court emphasized

> that the preemption of the Texas Trust Code is a narrow and extraordinary event. Only the FDIC acting as Receiver of a failed federally chartered institution transferring the trust relationships to a successor banking institution could validly accomplish a transfer of trustee powers. In all other matters, the Texas

Trust Act controls the powers and duties of the trustee and the rights of the beneficiaries.

*Id.* The Cowdens appealed the district court's judgment.

Although this appeal technically relates only to the fiduciary appointments involving the B.T. Cowden Estate and the various Cowden trusts, the practical implications of our decision extend far beyond the impact on these positions and even beyond the impact on the remaining nine hundred plus fiduciary positions held by FRB–Midland on July 29, 1988. Twenty-four of the thirty-nine other FRBC institutions that were closed on that date had trust departments, and FDIC entered into purchase and assumption transactions purporting to transfer the fiduciary appointments of each of these to JRB Bank and thus to NCNB Texas. All totalled, the trust business of the FRBC institutions involved approximately one thousand appointments as executor, administrator, or guardian of estates involved in proceedings pending in approximately ninety-six different local courts statewide, more than seventeen thousand trusts created by various trust instruments, and over nine thousand corporate and employee benefit trusts. The assets of these estates and trusts are valued at approximately $50 billion. Evidence presented in the district court suggested that an attempt by NCNB Texas to obtain state court appointments as successor fiduciary for each of these positions would take several years and cost $8 million in legal expenses.[6] Thus, a decision overturning the

---

**5.** The court's judgment dealt explicitly only with the appointment of NCNB Texas as successor trustee of the Cowden trusts. Earlier in its opinion, however, the court had noted that the Cowdens were challenging NCNB Texas' status as the successor independent executor of the B.T. Cowden Estate and had held that "the same principles control the application of federal law with respect to the trustee and executor successorship." *NCNB Texas Nat'l Bank v. Cowden,* 712 F.Supp. 1249, 1252 n. 6 (W.D.Tex.1989).

**6.** This estimate was given by Robert McKenzie, the Executive Vice President of Trust and Investment Services for NCNB Texas, and was based in part on events following the failure of the First National Bank of Midland ("First National Midland"). FDIC declared First National

Midland insolvent in October of 1983 and subsequently entered into a purchase and assumption agreement with RepublicBank First National Midland ("RepublicBank Midland"), which later changed its name to First RepublicBank Midland and is the insolvent institution involved in this case. Section 10.1 of that agreement contained provisions relating to the transfer of fiduciary appointments similar to those in section 4.7 of the P & A Agreement at issue in this proceeding. The agreement, as was the P & A Agreement, was approved by the United States District Court for the Western District of Texas. Rather than relying on the agreement as authority to operate as successor fiduciary, however, RepublicBank Midland instituted numerous lawsuits in state court to secure appointment as successor trustee and executor of individual

district court's ruling would not only force FDIC and/or NCNB Texas to incur substantial costs in attempting to secure appointment of NCNB Texas as a successor fiduciary, but it would also leave literally thousands of fiduciary positions vacant for a period of years. These considerations, though not dispositive of the issues before us, are relevant to the determination of Congress' goals in granting FDIC authority to deal with bank failures.

## II.

### A.

■ When Congress acts within the scope of its constitutionally delegated authority, the supremacy clause empowers Congress "to pre-empt state laws to the extent it is believed that such action is necessary to achieve its purposes." *City of New York v. Federal Communications Comm'n,* 486 U.S. 57, 63, 108 S.Ct. 1637, 1642, 100 L.Ed.2d 48 (1988). Likewise, Congress may delegate regulatory authority to an administrative agency, and when the agency acts within the scope of that authority, it may pre-empt and "render unenforceable state or local laws that are otherwise not inconsistent with federal law." *Id.; see Louisiana Pub. Serv. Comm'n v. Federal Communications Comm'n,* 476 U.S. 355, 369, 106 S.Ct. 1890, 1898–99, 90 L.Ed.2d 369 (1986); *Fidelity Fed. Sav. & Loan Ass'n v. De la Cuesta,* 458 U.S. 141, 153–54, 102 S.Ct. 3014, 3022–23, 73 L.Ed.2d 664 (1982). In this case, we must consider the pre-emptive effect of FDIC's actions in purporting to transfer FRB–Midland's fiduciary appointments to NCNB Texas. The analysis involves two considerations. We must first determine whether FDIC's conduct is the type of agency action giving rise to pre-emption of state law. If the conduct is pre-emptive, we must then determine whether FDIC acted within the scope of its congressionally delegated authority.

■ In undertaking our review, we bear in mind that "[t]he critical question in any pre-emption analysis is always whether Congress intended that federal regulation supersede state law." *Louisiana Pub. Serv. Comm'n,* 476 U.S. at 369, 106 S.Ct. at 1899, 90 L.Ed.2d 369. When the dispute involves the validity of agency action, however, the pre-emptive force of the action "does not depend on express congressional authorization to displace state law." *De la Cuesta,* 458 U.S. at 154, 102 S.Ct. at 3023, 73 L.Ed.2d 664. Rather, if "Congress has directed an administrator to exercise his discretion, his judgments are subject to judicial review only to determine whether he has exceeded his statutory authority or acted arbitrarily." *Id.* at 153–54, 102 S.Ct. at 3022–23, 73 L.Ed.2d 664. In its recent decision in *City of New York v. Federal Communications Commission,* the Supreme Court noted:

It has long been recognized that many of the responsibilities conferred on federal agencies involve a broad grant of authority to reconcile conflicting policies. Where this is true, the Court has cautioned that even in the area of pre-emption, if the agency's choice to pre-empt "represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute, we should not disturb it unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned."

*City of New York,* 486 U.S. at 64, 108 S.Ct. at 1642, 100 L.Ed.2d 48 (quoting *United States v. Shimer,* 367 U.S. 374, 383, 81 S.Ct. 1554, 1560, 6 L.Ed.2d 908 (1961)). As the cases dealing with the pre-emptive effect of agency actions suggest, substantial deference to an agency's determination of its authority may be appropriate.

### B.

The Supreme Court has clearly established that state law is pre-empted to the extent it conflicts with federal law. *See*

trusts and estates. McKenzie estimated that RepublicBank Midland expended approximately $390,000 on this litigation, which took two and one-half years to complete. *See* Affidavit of

Robert G. McKenzie, February 2, 1989, *NCNB Texas Nat'l Bank v. Cowden,* 712 F.Supp. 1249 (W.D.Tex.1989); *see also* Agreed Statement of Facts, *supra,* at 15–17.

*California Fed. Sav. & Loan Ass'n v. Guerra,* 479 U.S. 272, 281, 107 S.Ct. 683, 689, 93 L.Ed.2d 613 (1987); *Louisiana Pub. Serv. Comm'n,* 476 U.S. at 368, 106 S.Ct. at 1898, 90 L.Ed.2d 369; *De la Cuesta,* 458 U.S. at 153, 102 S.Ct. at 3022, 73 L.Ed.2d 664. Thus, state law is pre-empted "when there is outright or actual conflict between federal and state law," *Louisiana Pub. Serv. Comm'n,* 476 U.S. at 368, 106 S.Ct. at 1898, 90 L.Ed.2d 369, or when " 'compliance with both federal and state regulations is a physical impossibility,' " *Guerra,* 479 U.S. at 281, 107 S.Ct. at 689, 93 L.Ed.2d 613 (quoting *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142–43, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963)). A conflict also exists when "the state law stands 'as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' " *Id.* (quoting *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941)).

■ Under Texas law, in the absence of an explicit grant of authority in a will or trust instrument permitting transfer or delegation, the fiduciary responsibilities of an executor or trustee are neither transferrable nor delegable. *See Transamerican Leasing Co. v. Three Bears, Inc.,* 586 S.W.2d 472, 476 (Tex.1979); *West v. Hapgood,* 141 Tex. 576, 174 S.W.2d 963, 971 (1943); *Republic Nat. Bank & Trust Co. v. Bruce,* 130 Tex. 136, 105 S.W.2d 882, 884–85 (1937); *Grundy v. Broome,* 90 S.W.2d 939, 941–42 (Tex.Civ.App.—Amarillo 1936); *Fite v. Brevoort,* 90 S.W.2d 913, 914 (Tex. Civ.App.—Fort Worth 1936), *rev'd on other grounds,* 131 Tex. 523, 115 S.W.2d 1105 (1938). Thus, when an originating instrument does not provide otherwise, the appointment of a successor fiduciary is governed by statute.

The Texas Trust Code is codified as Subtitle B of Title 9 of the Texas Property Code. *See* Tex.Prop.Code Ann. §§ 111.-001–115.017 (Vernon 1984 & Supp.1990). Subsection 113.083(a) of the Texas Trust Code provides:

> On the death, resignation, incapacity, or removal of a sole or surviving trustee, a successor trustee shall be selected according to the method, if any, prescribed in the trust instrument. If for any reason a successor is not selected under the terms of the trust instrument, a court may and on petition of any interested person shall appoint a successor in whom the trust shall vest.

*Id.* § 113.083(a). Section 115.001 of the Texas Trust Code grants state district courts exclusive jurisdiction over the appointment of trustees. *Id.* § 115.001. Thus, with respect to the Cowden trusts, Texas law would require that the vacancy resulting from FRB–Midland's insolvency be filled with the appointment of a successor trustee either pursuant to the procedures set forth in the trust instruments or by a state district court judge.

The Texas Probate Code provides similar guidelines for the appointment of successor independent executors. Section 154A(a) of the Code provides:

> If the will of a person who dies testate names an independent executor who, having qualified, fails for any reason to continue to serve, or is removed for cause by the court, and the will does not name a successor independent executor ..., all of the distributees of the decedent as of the filing of the application for an order continuing independent administration may apply to the county court for the appointment of a qualified person, firm, or corporation to serve as successor independent executor. If the county court finds that continued administration of the estate is necessary, the county court shall enter an order continuing independent administration and appointing the person, firm, or corporation designated in the application as successor independent executor, unless the county court finds that it would not be in the best interest of the estate to do so. Such successor shall serve with all of the powers and privileges granted to his predecessor independent executor.

Tex.Prob.Code Ann. § 154A(a) (Vernon 1980). Thus, with respect to the B.T. Cowden Estate, Texas law would require that the vacancy in the independent executor

position created by FRB–Midland's insolvency be filled with a successor independent executor appointed by a county court upon proper application.

■ FDIC seeks to skirt these state-mandated procedures by means of the P & A Agreement, in which it transferred FRB–Midland's trust business to JRB Bank and authorized JRB Bank to succeed to FRB–Midland's "fiduciary or representative capacities ... to the same extent as though [it] had originally assumed the same." As a result of OCC's approval of the acquisition proposal, NCNB Texas stepped into JRB Bank's shoes. To the extent Texas law controls the appointment of a successor fiduciary, the transfer in the P & A Agreement had no effect and NCNB Texas is without authority to exercise the fiduciary responsibilities. There is clearly a conflict between Texas law relating to the selection of successor fiduciaries and FDIC's actions in attempting to transfer FRB–Midland's fiduciary appointments to NCNB Texas. We must thus determine whether FDIC had authority to transfer the appointments without resort to the procedures required by Texas law.

### C.

■ When a federally insured banking institution fails, FDIC, as insurer of the institution's deposits, is obligated to reimburse depositors, within the limits provided by law, for losses they have suffered. FDIC may fulfill this obligation by either of two methods. First, FDIC may simply liquidate the failed bank's assets, pay off insured deposits with the proceeds, and cover any shortfall by drawing on the deposit insurance fund. As other courts have noted, this option is quite disruptive. "Accounts are frozen, checks are returned unpaid, ... depositors may wait months to recover even the insured portion of their funds, and uninsured funds may be irrevocably lost." *Gunter v. Hutcheson*, 674 F.2d 862, 865 (11th Cir.), *cert. denied*, 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982); *see Federal Deposit Ins. Corp. v. Wood*, 758 F.2d 156, 160–61 (6th Cir.), *cert. denied*, 474 U.S. 944, 106 S.Ct. 308, 88 L.Ed.2d 286 (1985); *Federal Deposit Ins. Corp. v. Merchants Nat'l Bank*, 725 F.2d 634, 637 (11th Cir.), *cert. denied*, 469 U.S. 829, 105 S.Ct. 114, 83 L.Ed.2d 57 (1984). As an alternative, FDIC may in certain circumstances arrange a purchase and assumption transaction, in which another bank "purchases" the failed bank and continues its operations without interruption. The purchase and assumption approach is generally considered to be more desirable than the liquidation option, because "[t]he transaction usually is arranged overnight, so that banking services are not interrupted for a single business day." *Wood*, 758 F.2d at 160; *see Merchants Nat'l Bank*, 725 F.2d at 638. Moreover, "[d]epositors receive the full amounts of their deposits, rather than only the insured amounts." *Wood*, 758 F.2d at 160–61.

Notwithstanding its desirability as a practical matter, however, implementation of the purchase and assumption approach has in the past proven to be difficult. As a result of both the obvious need for secrecy regarding the condition of a bank approaching insolvency and the desire to maintain the bank's operations without interruption, purchasing banks have often been unable to get a clear picture of the insolvent bank's financial condition. *See Gunter*, 674 F.2d at 865. Congress addressed these problems in the Competitive Equality Banking Act of 1987, Pub.L. No. 100–86, § 503, 101 Stat. 552, 629–32, by authorizing FDIC to create "bridge banks." "A 'bridge bank' is a new national bank established by the FDIC to take over the assets and liabilities of a failed bank and to carry on its business for a limited time." S.Rep. No. 19, 100th Cong., 1st Sess. 61, *reprinted in* 1987 U.S.Code Cong. & Admin.News 489, 551. The purpose of the legislation was to "enable[ ] the FDIC to 'bridge' the gap between the failed bank and a satisfactory purchase-and-assumption or other transaction that cannot be accomplished at the time of failure." *Id.* at 60, *reprinted in* 1987 U.S.Code Cong. & Admin.News at 550.

■ FDIC and NCNB Texas rely primarily on the provisions of this bridge bank

legislation to support their pre-emption argument. At the time the transfers that provoked this litigation took place, the statute provided in part:

> (1) Establishment. When an insured bank is closed, the Corporation, in the Corporation's discretion ..., may establish a bridge bank to—
>
> (A) assume the deposits of the closed bank;
>
> (B) assume such other liabilities of the closed bank as the Corporation, in the Corporation's discretion, may determine to be appropriate;
>
> (C) purchase such assets of the closed bank as the Corporation, in the Corporation's discretion, may determine to be appropriate; and
>
> (D) perform any other temporary function which the Corporation may prescribe in accordance with this Act.
>
> ....
>
> (3) Transfer of assets and liabilities. (A) In general. Upon the organization of a bridge bank pursuant to this subsection, the Corporation, as receiver, or any other receiver appointed with respect to the closed insured bank may, subject to the approval of any such transfer by a court of competent jurisdiction, transfer any assets and liabilities of the closed insured bank to the bridge bank.
>
> ....

12 U.S.C. § 1821(i) (current version at 12 U.S.C. § 1821(n)). The Federal Deposit Insurance Act (FDIA) defined "deposit" to include "trust funds ... received or held by [a] bank, whether held in the trust department or held or deposited in any other department of such bank." *Id.* § 1813(*l*)(2) (amended 1989). The FDIA further defined "trust funds" as "funds held by an insured bank in a fiduciary capacity and includ[ing], without being limited to, funds held as trustee, executor, administrator, guardian, or agent." *Id.* § 1813(p) (amended 1989). Thus, we have no hesitation in concluding that in granting FDIC authority to transfer "deposits" of the failed bank to the newly created bridge bank section 1821(i) authorized FDIC to transfer the assets subject to the Cowden trusts and estate. This is simply the beginning of our analysis, however, because we must next determine whether FDIC also had authority to transfer the bank's fiduciary appointments. Although it seems highly unlikely Congress would intend to permit the transfer of the holdings but not the transfer of the accompanying oversight responsibilities, on its face the statute does not explicitly authorize the latter action.

The Cowdens initially argue that, absent an explicit direction from Congress indicating an intent to permit the transfer of fiduciary appointments, the bridge bank statute should not be construed as pre-empting state laws regulating such transfers. In support of this position, they point to 12 U.S.C. section 215(e), which deals with the consolidation of national banks and provides explicitly that the consolidated banks are authorized to continue in the fiduciary capacities previously exercised without resort to any appointment procedures.[7] Based on this provision, the Cowdens argue "that Congress knew how to 'directly' and 'actually' pre-empt state law so as to allow fiduciary appointments and interests to be transferred" and that absent similarly explicit language the intent to pre-empt obviously was absent.

This line of reasoning fails to focus on the proper issue. It is true that in section 215(e) Congress did directly pre-empt any conflicting state laws regulating the appointment of successor fiduciaries. The present case differs, however, in that it

---

**7.** Section 215(e) provides in part:

The consolidated national banking association, upon the consolidation and without any order or other action on the part of any court or otherwise, shall hold and enjoy all rights of property, franchises, and interests, including appointments, designations, and nominations, and all other rights and interests as trustee, executor, administrator, registrar of stocks and bonds, guardian of estates, assignee, receiver, and committee of estates of lunatics, and in every other fiduciary capacity, in the same manner and to the same extent as such rights, franchises, and interests were held or enjoyed by any one of the consolidating banks or banking associations at the time of consolidation, subject to the conditions hereinafter provided.

was FDIC's attempt to transfer the fiduciary appointments through the P & A Agreement and not the bridge bank statute itself that created the conflict with state law. As was noted above, when it is an agency action that is in conflict with state law, the validity of the agency action does not depend on express congressional authorization to displace the state law. The Supreme Court thus has "emphasized that in a situation where state law is claimed to be pre-empted by federal regulation, a 'narrow focus on Congress' intent to supersede state law [is] misdirected.' " *City of New York*, 486 U.S. at 64, 108 S.Ct. at 1642, 100 L.Ed.2d 48 (quoting *De la Cuesta*, 458 U.S. at 154, 102 S.Ct. at 3023, 73 L.Ed.2d 664). Rather, "the correct focus is on the federal agency that seeks to displace state law and on the proper bounds of its lawful authority to undertake such action." *Id.* at 64, 108 S.Ct. at 1642, 100 L.Ed.2d 48. Certainly, when it enacted the bridge bank statute Congress could have explicitly required the transfer of fiduciary appointments or explicitly authorized FDIC to make such transfers. That Congress did not do so is not dispositive, however. The issue is whether the authority to make the transfers is within the scope of the authority Congress granted FDIC in the bridge bank statute. We turn to that issue now.

■ FDIC and NCNB Texas argue that the authority to transfer FRB–Midland's fiduciary appointments was provided in those provisions permitting FDIC to transfer "any assets" of the closed bank and permitting the bridge bank to "purchase such assets of the closed bank as the Corporation ... may determine to be appropriate." The FDIA provides no definition of "assets," however, and the Cowdens contend that a definition that would encompass fiduciary appointments is unjustified. The Cowdens rely on a federal district court decision in which it was noted that "[a]ssets are generally defined as property of any kind, whether real or personal, tangible or intangible, legal or equitable, which can be made available for the payment of debts." *Harris v. United States*, 431 F.Supp. 1173, 1178 (E.D.Va.1977). They contend that because fiduciary appointments are generally not transferrable, the appointments cannot be made available to pay debts and thus are not assets. The Cowdens also point to the handling of fiduciary appointments on banks' financial statements. The Agreed Statement of Facts indicated the following:

> Neither the trust department nor the assets of the individual trusts administered by First RepublicBank Midland were ever reported by that bank to regulatory agencies, or included in published statements of condition, as "assets" of First RepublicBank Midland. Banks do not report on their statements of condition their trust departments and/or the assets they hold in trust as being "assets" of the bank. However, not all of a bank's assets are shown separately on its statement of condition. The income generated by a trust department is reported on the bank's income and expense statement and reflected on the bank's statement of condition as cash.

Agreed Statement of Facts, *supra*, at 8–9.

In response to the Cowdens' objections in the court below, NCNB Texas submitted the affidavit of Stanley Scott, a certified public accountant, who stated that in his "professional opinion the fiduciary appointments held by First RepublicBank Midland prior to its failure unquestionably were assets of that bank." Affidavit of Stanley J. Scott at 4, *NCNB Texas Nat'l Bank v. Cowden*, 712 F.Supp. 1249 (W.D.Tex.1989). In support of his opinion, Scott referred to accounting principles that suggest an asset has three primary characteristics:

> "(a) it embodies a probable future benefit that involves a capacity, singly or in combination with other assets, to contribute directly or indirectly to future net cash inflows,
>
> (b) a particular entity can obtain the benefit and control others' access to it, and
>
> (c) the transaction or other event giving rise to the entity's right to or control of the benefit has already occurred."

*Id.* (quoting Financial Accounting Standards Board, Statement of Financial Accounting Concepts No. 6, ¶ 26). Scott indi-

cated that whether a particular interest is included on a business' balance sheet is not determinative of its status as an asset. *Id.* at 5. There was also evidence in the district court that NCNB Texas receives commissions and fees from the fiduciary appointments totalling approximately $100 million annually. *See* NCNB Texas' Response to Cowdens' First Request for Discovery at 5, *NCNB Texas Nat'l Bank v. Cowden,* 712 F.Supp. 1249 (W.D.Tex.1989). With respect to the FRB–Midland appointments, NCNB Texas indicated that in 1987 the fiduciary appointments generated income of $2.7 million. *See* Objections and Responses of Federal Deposit Insurance Corporation as Receiver of First Republic-Bank Midland, N.A. to Defendants' First Request for Discovery at 4, *NCNB Texas Nat'l Bank v. Cowden,* 712 F.Supp. 1249 (W.D.Tex.1989). This evidence and the breadth of the statutory language resulted in the district court's refusal to interpret "asset" "in a manner which would read out of the statute trust relationships. Such a finding would require adding the words 'balance sheet' or 'tangible' into the statute and speculat[ion] about Congress' intent as to the meaning of 'asset' when the statute itself is unambiguous." *NCNB Texas Nat'l Bank,* 712 F.Supp. at 1255 n. 12.

We agree with the district court's conclusion for several reasons. First, as noted above, we think it highly unlikely Congress would intend to authorize the transfer of trust and estate holdings but not the transfer of the appointments and accompanying oversight and managerial responsibilities. Second, it is not inconceivable that a fiduciary appointment could reasonably be considered an asset. The decision of banks in general and FRB–Midland in particular not to include trust departments as assets on their financial statements is not determinative of the status of fiduciary positions. Indeed, an interpretation of "asset" that encompasses a bank's fiduciary appointments is consistent with the accounting principles mentioned above, in that the fiduciary positions generate substantial amounts of income for the bank each year and other banking institutions may not gain access to that source of income without resort to legal proceedings. Third, federal courts have in a related context approved regulatory authorities' transfers of rights held by failed banking institutions that would not have been transferrable under state law. *See Federal Deposit Ins. Corp. v. Main Hurdman,* 655 F.Supp. 259, 267–68 (E.D.Cal.1987) (holding authority to transfer "every asset" of failed bank includes authority to transfer choses in action not assignable under state law); *Federal Deposit Ins. Corp. v. Abraham,* 439 F.Supp. 1150, 1151–52 (E.D.La.1977) (same); *Federal Sav. & Loan Ins. Corp. v. Fielding,* 309 F.Supp. 1146, 1151 (D.Nev. 1969) (same), *cert. denied,* 400 U.S. 1009, 91 S.Ct. 567, 27 L.Ed.2d 621 (1971); *Federal Deposit Ins. Corp. v. Rectenwall,* 97 F.Supp. 273, 274–75 (N.D.Ind.1951) (same). Therefore, even if the classification of an interest as an asset turns on an entity's authority to transfer the interest, FRB–Midland's lack of authority under state law to transfer its fiduciary appointments to another institution does not foreclose the possibility that the appointments could be transferrable and thus be classified as assets when FDIC acts as receiver of an insolvent bank. Finally, the language and history of the bridge bank statute makes clear that Congress intended FDIC, when acting as receiver, to be able to transfer all aspects of a failed banking institution's operations to the newly created bridge bank. This is in fact one of the very purposes of granting FDIC authority to enter into purchase and assumption transactions. The fiduciary responsibilities carried out by a bank's trust department, though not indispensable to the successful operation of the bank, are certainly a substantial and important part of a bank's everyday activities. Including fiduciary appointments within the meaning of "asset" is thus consistent with the congressional goal of maintaining the operations of a failed bank. Any other conclusion would have resulted in vacancies on July 29, 1988, in each of the approximately twenty-seven thousand fiduciary positions held by FRBC institutions.

We find additional support for our holding in recent amendments to the bridge

bank statute. The Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA), Pub.L. No. 101–73, 1989 U.S.Code Cong. & Admin.News (103 Stat.) 183, amended substantial portions of the FDIA. As amended, the bridge bank provisions affirm the authority of FDIC to transfer the assets and liabilities of a failed bank, see 12 U.S.C. § 1821(n)(3)(A)(i), and indicate that "the trust business, including fiduciary appointments, of any insured bank in default is included among its assets and liabilities," id. § 1821(n)(3)(A)(iii). Similarly, the statute provides that the newly created bridge bank may "purchase such assets (including assets associated with any trust business)" of the failed bank that FDIC considers appropriate to transfer. Id. § 1821(n)(1)(B)(iii). This language suggests that fiduciary appointments may have been one type of obligation Congress thought FDIC should be able to transfer to a bridge bank under the authority provided by the statute's previous wording. The Cowdens urge us to draw a contrary conclusion, contending that the addition of the language demonstrates the lack of authority to make such a transfer under the statute as it read in 1988. We disagree.

A number of courts have recognized that "changes in statutory language need not ipso facto constitute a change in meaning or effect." United States v. Montgomery County, Md., 761 F.2d 998, 1003 (4th Cir. 1985); see Phillips Petroleum Co. v. United States Envtl. Protection Agency, 803 F.2d 545, 557–58 (10th Cir.1986); Callejas v. McMahon, 750 F.2d 729, 731 (9th Cir. 1984); Brown v. Marquette Sav. & Loan Ass'n, 686 F.2d 608, 615 (7th Cir.1982); United States v. Tapert, 625 F.2d 111, 121

(6th Cir.), cert. denied, 449 U.S. 952, 101 S.Ct. 356, 66 L.Ed.2d 216 (1980), 449 U.S. 1034, 101 S.Ct. 609, 66 L.Ed.2d 496 (1980), 449 U.S. 1034, 101 S.Ct. 610, 66 L.Ed.2d 496 (1980). Indeed, a legislative body may amend statutory language "to make what was intended all along even more unmistakably clear." Montgomery County, Md., 761 F.2d at 1003; see Tapert, 625 F.2d at 121 (indicating that "[i]t is a common and customary legislative procedure to enact amendments strengthening and clarifying existing laws"). We realize that reliance on subsequent legislative actions to determine the meaning of an earlier statute is hazardous. See Brown, 686 F.2d at 615. Nevertheless, several considerations lead us to conclude that the FIRREA amendments to the bridge bank statute support our holding concerning the scope of the term "asset."

We note initially that although the current language is certainly more explicit in its grant of authority to FDIC, it cannot be read as foreclosing a reading of the previous language that would include fiduciary appointments within the meaning of "asset." In addition, our review of the legislative history discussing the amendments reveals no indication on the part of Congress that it intended to increase FDIC authority with respect to transfer of interests held by insolvent banking institutions. What little legislative history there is suggests Congress was primarily concerned with clarifying existing law.[8] The absence of dispositive legislative history in itself counsels against a conclusion that Congress intended to change the law. See id. at 615 (suggesting that in the absence of an indication "that the new statute was intended

---

**8.** In discussing the amendments to FDIC's authority as receiver, the House Report indicates that "[t]he authorities essentially parallel those heretofore exercised by ... the FDIC, ... are designed to give the FDIC power to take all actions necessary to resolve the problems posed by a financial institution in default," and include authority "to transfer assets or liabilities of the financial institution, including those associated with any trust business carried on by the institution, without any further approvals." H.R.Rep. No. 54, 101st Cong., 1st Sess., pt. I, at 330–31, reprinted in 1989 U.S.Code Cong. & Admin.News 86, 126–27. In discussing the stat-

ute's bridge bank provisions specifically, the Report suggests that FIRREA "make[s] technical changes in the new bank and bridge bank provisions" and "clear[s] up some of the subsections' ambiguities." Id. at 333, reprinted in 1989 U.S. Code Cong. & Admin.News at 129. The House Conference Report provides even less guidance. In discussing substantive changes made to the bridge bank provisions, however, it omits any reference to the authority to transfer fiduciary appointments. See H.R.Conf.Rep. No. 222, 101st Cong., 1st Sess. 396–98, reprinted in 1989 U.S.Code Cong. & Admin.News 432, 435–37.

to change the law, the new language is persuasive authority of the proper construction of the original" statute). Finally, we are quite aware that by the time FIRREA was enacted this dispute had been litigated through the district court and was pending before this court on appeal. Other courts have noted that the existence of a dispute in the courts, such as a circuit split, may suggest that Congress was provoked to enact an amendment to clarify rather than change the law. *See Montgomery County, Md.*, 761 F.2d at 1003; *Callejas*, 750 F.2d at 731; *Brown*, 686 F.2d at 615. We think this same principle applies in this situation. Given that this litigation apparently was necessary to resolve the very important issue of the scope of FDIC authority, it is quite likely Congress felt a need to clarify the law to avoid any future disputes. Individually, these considerations might not justify any conclusion as to Congress' intent. Taken together, however, these factors in conjunction with our review of the previous and amended versions of the bridge bank provisions lead us to conclude that in making explicit FDIC's authority to transfer fiduciary appointments Congress was clarifying its intent rather than expanding the scope of FDIC authority. We thus hold that FRB–Midland's fiduciary appointments were assets of the bank within the meaning of the bridge bank statute and that FDIC could transfer those appointments through the P & A Agreement.

■ The bridge bank provisions of the FDIA granted FDIC broad discretion to alleviate the potential disruption of banking services resulting from bank failures. The preceding analysis indicates that the authority to transfer the fiduciary appointments of an insolvent bank to a federally created bridge bank was included within this grant. To the extent state law regulating the transfer of fiduciary appointments conflicted with this authority, it was pre-empted. Thus, as a result of the P & A Agreement, NCNB Texas succeeded as a matter of federal law to the fiduciary appointments previously held by FRB–Midland. Thereafter, NCNB Texas was legally entitled to fulfill the responsibilities accompanying the appointments, including the distribution under proper circumstances of the holdings of the Cowden trusts.[9]

### D.

■ Having determined that the bridge bank statute authorized FDIC to transfer fiuuciary appointments, we briefly consider the extent to which state law regulating such appointments is pre-empted.[10] The analysis presented above indicates that FDIC's authority to transfer an insolvent bank's fiduciary appointments is based on federal law and is not limited by either state laws regulating the transfer of such appointments or the language in the originating document. Thus, assuming the originally designated fiduciary is a bank that becomes insolvent, notwithstanding any language in the trust agreement (or will) designating a successor trustee (or successor executor) to serve should the designated trustee (or executor) become insolvent, FDIC has authority to transfer the appointment to a bridge bank. The obvious issue raised by this scenario is whether there is any limit to the pre-emption of state law that would permit the beneficiaries of a trust or will or the entity designated in an instrument as an alternate fiduciary subsequently to obtain a transfer of the fiduciary appointment from the bridge bank.

The Cowdens suggest the pre-emptive effect of FDIC authority should be limited by our finding the bridge bank to be a "temporary" successor fiduciary. Under

9. Our interpretation of the bridge bank statute forecloses any need to consider either the alternative rationale for the district court's holding or FDIC's and NCNB Texas' arguments concerning the development of federal common law.

10. During oral argument we urged counsel to submit additional comments addressing the propriety of a federal rule that would preserve for a beneficiary the ability to change fiduciaries following an FDIC transfer of an insolvent bank's fiduciary appointments to a bridge bank. Counsel for each party has submitted written comments responsive to our request, and we have considered their arguments and suggestions in reaching the conclusions set forth herein.

this approach, FDIC could transfer the appointments as permitted by the statute. However, if a provision in the originating instrument either designated or provided for the selection of a successor trustee, that provision would remain viable and a state court action could be brought to enforce it. The Cowdens also suggest that there should be a "window" of time following transfer of the appointments during which interested parties could bring an action with respect to any of the transferred appointments to obtain the appointment of a different successor fiduciary to serve permanently. The bridge bank could participate in the proceeding, but its entitlement to retain the appointment would not be presumed and the challenging party would not be required to show cause to justify designation of an alternative successor fiduciary. The Cowdens argue that this approach would accommodate both federal and state interests. The federal government's goal of maintaining banking services would be met because the bridge bank would serve as an interim fiduciary while parties decided on their course of action. It is likely that in most cases interested parties would simply accept the bridge bank as the successor fiduciary and the bank would carry out those responsibilities without any need for additional court action. Such an approach also would not unnecessarily interfere with state laws regulating the appointment of successor fiduciaries or with interested parties' expectations with regard to who will serve as fiduciary.

There is much to commend such an approach, and we have no doubt that FDIC could establish such procedures through the adoption of regulations. A review of the bridge bank statute, however, reveals no basis for requiring such a temporary appointment procedure. It is relatively clear that in enacting that legislation Congress intended to permit FDIC to establish a bank that would in essence be the mirror image, though undoubtedly with more profitable banking practices, of the insolvent institution. That is, the bridge bank is to continue banking operations to the same extent and with the same authority as the failed bank. FDIC has authority to accomplish this result through the transfer of fiduciary appointments, and nothing in the statute establishes a limit on a bridge bank's authority to retain such appointments. Accordingly, there is no basis on which to justify the imposition of a temporary fiduciary approach.

This does not mean that a bridge bank that succeeds to the fiduciary appointments of an insolvent bank may never be subject to removal. What it does mean is that the tenure of the bridge bank is governed by state law. Once the transfer of appointments is complete, the bridge bank is treated as any other fiduciary under state law and it may be removed from office for the same reasons. Under current Texas law, the removal of trustees is governed by section 113.082 of the Texas Trust Act.[11] The removal of executors and administrators is governed by various provisions in the Texas Probate Code.[12] We express no

---

**11.** Section 113.082 provides:

    (a) A trustee may be removed in accordance with the terms of the trust instrument, or, on the petition of an interested person and after hearing, a court may remove a trustee and deny part or all of the trustee's compensation if:

        (1) the trustee materially violated or attempted to violate the terms of the trust and the violation or attempted violation results in a material financial loss to the trust;

        (2) the trustee becomes incompetent or insolvent; or

        (3) in the discretion of the court, for other cause.

    (b) A beneficiary, cotrustee, or successor trustee may treat a violation resulting in removal as a breach of trust.

Tex.Prop.Code Ann. § 113.082 (Vernon 1984).

**12.** For example, an independent executor may be removed in accordance with section 149C, which provides in part:

    (a) The county court, a statutory probate court, a county court at law with probate jurisdiction, or a district court of the county, on its own motion or on motion of any interested person, after the independent executor has been cited by personal service to answer at a time and place fixed in the notice, may remove an independent executor when:

        (1) the independent executor fails to return within ninety days after qualification, unless such time is extended by order of the court, an inventory of the property of the

opinion as to the proper interpretation of those removal provisions other than to state that it appears unlikely that they would support removal of a bridge bank as fiduciary simply because the originating instrument designated an alternate fiduciary or set forth a procedure for selecting an alternate fiduciary. However, should state legislatures consider the designation of a fiduciary of choice sufficiently important, our decision should not be read as prohibiting the amendment of removal statutes to provide greater freedom in the replacement of fiduciaries. Of course, any such statute may not be aimed solely at bridge banks, for it has been established at least since *McCulloch v. Maryland,* 17 U.S. (4 Wheat.) 316, 4 L.Ed. 579 (1819), that states may not enact laws that discriminate against national banks. Thus, any modification of removal statutes should apply generally to withstand constitutional scrutiny.

It seems likely that most states will simply accept the consequences of FDIC's transfer authority. The pre-emption that results is indeed narrow. It affects only the appointment of successor fiduciaries when FDIC determines a purchase and assumption transaction is appropriate to continue the operations of an insolvent banking institution. In all other respects, state regulation of fiduciaries is unaffected. In the end, the benefits of continuous banking service, including the continuous service of a knowledgeable fiduciary, that result from the pre-emption clearly will outweigh the infringement on state interests.

The judgment of the district court is AFFIRMED.

estate and list of claims that have come to his knowledge;

(2) sufficient grounds appear to support belief that he has misapplied or embezzled, or that he is about to misapply or embezzle, all or any part of the property committed to his care;

(3) he fails to make an accounting which is required by law to be made;

(4) he fails to timely file the notice required by Section 128A of this code;

(5) he is proved to have been guilty of gross misconduct or gross mismanagement in the performance of his duties; or

(6) he becomes an incompetent, or is sentenced to the penitentiary, or from any other cause becomes legally incapacitated from properly performing his fiduciary duties. Tex.Prob.Code Ann. § 149C (Vernon Supp. 1990).