878 F.Supp. 943 (1995)
BANK ONE, TEXAS, N.A., Plaintiff-Counterdefendant,
v.
The PRUDENTIAL INSURANCE COMPANY OF AMERICA and Texas Commerce Bank, N.A., Defendants-Counterplaintiffs-Third-Party Plaintiffs-Third-Party Counterdefendants,
and
Federal Deposit Insurance Corporation and Capital Associates International, Inc., Third-Party Defendants-Third-Party Counterplaintiffs.
Civ. A. No. 3:92-CV-0535-D.
United States District Court, N.D. Texas, Dallas Division.
March 16, 1995.
*944 *945 *946 Michael P. Lynn and Steven H. Stodghill of Lynn, Stodghill & Melsheimer, L.L.P., Dallas, TX, for Bank One, Texas, N.A.
Fletcher L. Yarbrough, Corbet F. Bryant, Jr., Michael Prince (argued), George M. Kryder, III, and Barbara J. Elias-Perciful of Carrington, Coleman, Sloman & Blumenthal, L.L.P., Dallas, TX, for The Prudential Co. of America.
Craig L. Weinstock (argued), Mark C. Taylor, and Roger B. Cowie of Liddell, Sapp, Zivley, Hill & LaBoon, L.L.P., Dallas, TX, for Texas Commerce Bank, N.A.
Dennis S. Klein (argued), Robert B. Funkhouser, Christopher J. Austin, and M. Kathleen O'Connor of Hughes Hubbard & Reed, Washington, D.C. and Roy G. Morris, Steven A. DeMonbreum, Richard E. Anderson, Joseph W. Spence, and Thomas J. Fisher of F.D.I.C.-Legal Div., Dallas, TX, for F.D.I.C.
Jay M. Vogelson (argued) and David A. Klingler of Stutzman & Bromberg, P.C., Dallas, TX, for Capital Associates Intern., Inc.
*947 FITZWATER, District Judge:
This pre-FIRREA[1] litigation presents questions concerning the rights of secured creditors of a failed national bank, and of the Federal Deposit Insurance Corporation ("FDIC"), with respect to a sale-leaseback transaction entered into by the creditors and the bank prior to its insolvency. The creditors seek to recover against the pledged collateral on the basis of contractual rights and obligations that took effect by operation of an ipso facto clause upon the failed bank's insolvency. Among the questions the court must decide are whether the creditors have a provable claim, as required by 12 U.S.C. § 194; whether the transaction is a preference rendered invalid by 12 U.S.C. § 91; whether the ipso facto clause is enforceable; and whether public policy considerations, and the FDIC's powers to disaffirm burdensome leases and marshal the assets of failed institutions, are sufficient to permit it to abrogate the creditors' rights in the transaction. Today's decision may lend credence to Congress' wisdom in enacting FIRREA. On the basis of the applicable pre-FIRREA law, the court holds in favor of the creditors.

I

A
In December 1987 MBank-Dallas, N.A. ("MBank") and third-party-defendant Capital Associates International, Inc. ("Capital")[2] entered into a sale-leaseback transaction. MBank sold to Capital for the sum of approximately $29.5 million certain furniture, fixtures, and equipment ("FF & E") that MBank and its parent company, MCorp, intended to use in their new headquarters building. The FF & E includes such property as the bank vault door, escalators, furniture, and computer equipment needed to operate MBank. In turn, Capital simultaneously leased the FF & E back to MBank and MCorp[3] pursuant to a collateralized equipment lease ("Original Lease"). The parties secured MBank's performance of the payment of rent and other obligations by means of a Security, Collateral Maintenance and Pledge Agreement ("Original Pledge Agreement"). This agreement obligated MBank to pledge certain Class A Senior/Subordinated Automobile Loan Pass-Through Certificates Series 1987-1 and other automobile loan certificates (the "MCar Certificates") and their proceeds (the "MCar Proceeds") (collectively the "MCar Assets"). The MCar Certificates were large groups of packaged automobile loans. By collateralizing the Original Lease, MBank was able to lower its rent payments.
Pursuant to the Original Pledge Agreement, MBank granted Capital a first priority security interest in the MCar Assets to secure MBank's performance under the Original Lease, Original Pledge Agreement, and other specified transactional documents. The Original Pledge Agreement permitted Capital to assign its rights to any lender who financed Capital's acquisition of the FF & E.
*948 Capital made a down payment to MBank of approximately $4.5 million of the total purchase price. Capital lacked the financial capability to pay the entire cost. It therefore financed part of the balance of the purchase price through a non-recourse loan in the sum of approximately $25.8 million from defendant The Prudential Insurance Company of America ("Prudential").[4] Capital executed promissory notes ("Notes") in favor of Prudential. Pursuant to a participation agreement among Capital, MBank, Prudential, and defendant Texas Commerce Bank, N.A. ("TCB"),[5] Prudential agreed to pay MBank $25,455,000, representing the balance of the purchase price for the FF & E, and accrued interest.
In February 1988, as part of the Prudential financing transaction, MBank and Capital entered into a First Amendment to the Lease ("Lease").[6] They also executed an Amended and Restated Security Collateral Maintenance and Pledge Agreement (the "Pledge Agreement"). TCB acted as Indenture Trustee under an Indenture of Assignment of Lease, Rents and Security Agreement (the "Indenture") between Capital and TCB. The Indenture secured the Prudential loan to Capital by granting TCB as Trustee a security interest, for the benefit of Prudential, in the MCar Certificates and MCar Proceeds, FF & E, the Lease, and the Pledge Agreement.
Section 17 of the Lease specified several acts, omissions, or events that constituted events of default. Section 17(h) provided that an act or declaration of insolvency was such an event. Section 18 of the Lease afforded Capital various remedies upon the occurrence of an event of default. Section 18(e)[7] contained a clause (the "Ipso Facto Clause") that provided an exclusive remedy upon the occurrence of an event of default specified in § 17(h) of the Lease, that is, upon an act or declaration of insolvency. According to § 18(e), upon an act or declaration of insolvency (1) the Lease automatically *949 terminated; (2) MBank immediately and unconditionally became obligated to pay all unpaid rent due and payable for all periods up to and including the rent payment due following the event of default; and (3) MBank immediately and unconditionally became obligated to pay a sum as liquidated damages (the Casualty Value of the Leased Equipment ("Casualty Value")), determined according to a formula prescribed by § 18(e) and attachments to the Lease.[8] This remedy automatically took effect without option, notice, or any other action required by Capital. It replaced MBank's obligation to return the FF & E and hold MBank liable for damages. Section 18(e) also obligated Capital to convey the FF & E to MBank by bill of sale, upon receiving payment of the Casualty Value. Section 7(b) of the Pledge Agreement[9] provided for a substantially similar remedy.
The effect of the transaction was to give Prudential and Capital security interests in the FF & E, MCar Certificates, MCar Proceeds, Lease, and Pledge Agreement, and to provide similar interests to TCB in trust for the benefit of Prudential.
During 1988 MBank periodically pledged other MCar Certificates to secure the Lease. As individual borrowers reduced their indebtedness on their automobile notes, the market value of the MCar Certificates decreased. Because the Lease obligated MBank to preserve the collateral value of the MCar Certificates, MBank pledged additional MCar Certificates in June, October, and December 1988.
On or about March 27, 1989 a number of MCorp-owned banks sought repayment from MBank of overnight loans they had made to the institution. On March 27 and 28, 1989 MBank defaulted on the loans. On March 28, 1989 the Federal Reserve Bank of Dallas cut off MBank's line of credit and demanded payment of in excess of $1 billion in overnight loans that it had made to MBank. MBank was unable to pay these loans and thereby defaulted. On March 29, 1989 the Office of the Comptroller of the Currency ("OCC") declared 20 MBanks, including MBank, insolvent.[10] The OCC placed MBank in receivership, and appointed third-party-defendant FDIC as its receiver.[11] Rental due under the Lease had already been paid through June 1989 at the time of these events.
TCB notified the parties that the insolvency of MBank had triggered an event of default under the Indenture. It directed the master servicer of the MCar Certificates to forward all future proceeds directly to TCB. Prudential and TCB asserted that the declaration of insolvency triggered the Ipso Facto Clause of the Lease, thereby automatically terminating the Lease, and making the amounts owed under the Lease immediately due and payable. Based on MBank's insolvency, *950 Prudential accelerated Capital's non-recourse Notes.
Upon its appointment as receiver, FDIC-Receiver immediately implemented a Purchase and Assumption Agreement ("P & A Agreement") by which it transferred all deposits and certain liabilities and assets from the MBank receivership estate to the newly-created Deposit Insurance Bridge Bank ("DIBB"). The P & A Agreement did not transfer the Lease to DIBB, but afforded DIBB a 120-day period in which to assume the Lease. The MBank receivership and bridge bank transaction were effected without any cessation or interruption of daily banking activities.
DIBB and FDIC-Receiver notified Prudential and TCB of their position that the Lease's default, acceleration, termination, and penalty provisions were unenforceable. DIBB continued to provide the collateral reports required under the Lease. On July 1, 1989 FDIC-Receiver and DIBB paid what they contended was the semi-annual rental payment to keep the Lease current through December 1989. Prudential applied this sum of approximately $2.8 million to liquidated damages that it contended were due under the Lease, and disputed that the payment effected a reinstatement of the Lease.
On September 13, 1989 FDIC-Receiver determined the Lease was burdensome and purported to repudiate it. As of July 1989 DIBB had been renamed Bank One, Texas, N.A. ("Bank One"). Plaintiff Bank One[12] informed Prudential that it was not entitled to any of the MCar Assets following such disaffirmance, and requested that all the MCar Assets held in trust by TCB be returned. TCB nevertheless continued to pay the MCar Proceeds to Prudential. Acting under directions from Prudential, TCB retained the MCar Assets on behalf of Prudential to satisfy the Prudential loan to Capital. TCB threatened to sell the MCar Certificates to pay Capital's liability to Prudential on the Notes and then pay Capital's claims under the Lease. Prudential directed TCB to pay Prudential certain of the proceeds from the MCar Certificates that had been collected and held in trust. TCB did so after obtaining a written indemnity from Prudential.
Over a period of approximately six months, Prudential received periodic payments from TCB, eventually totaling $23,076,698.96. This resulted in payment in full of the Prudential loan to Capital. Prudential returned the Capital Notes to TCB, who cancelled them. Pursuant to the Indenture, upon payment in full to Prudential of all amounts due under the Prudential loan, the Indenture terminated, TCB became obligated to distribute the balance of the MCar Proceeds to Capital, and TCB was required to execute and deliver any release, notice, or other documents confirming the termination of the Indenture and TCB's interest in the Indenture estate.
Bank One entered into a contract with Capital to purchase the FF & E. Consummation of the contract was conditioned on release by Prudential and TCB of all liens on the FF & E.

B
Bank One initiated this suit in state court against Prudential and TCB. Bank One alleges that after MBank was declared insolvent, TCB as Indenture Trustee exercised its right under the Indenture to retain the proceeds of the MCar Certificates. Bank One contends this resulted in full payment to Prudential and TCB. It seeks a declaratory judgment that the debts have been satisfied; that any liens held by Prudential and TCB have been extinguished by full payment; that the Indenture has terminated; that Prudential and TCB have no legal or equitable right, title, estate, lien, or interest in the FF & E; and that Prudential and TCB be ordered to execute and deliver termination statements, releases of liens, and/or any other documents that Bank One might reasonably request for the purpose of evidencing the termination of liens or interests in the FF & E. Bank One also sues Prudential for tortious interference or, alternatively, conspiracy to interfere, with *951 Bank One's prospective and existing contractual relations with Capital, based upon Prudential's refusal to execute and to direct TCB to execute written releases, thereby creating a cloud on the title to the FF & E so that Bank One cannot purchase it.
Prudential counterclaims against Bank One and brings a third-party action against the FDIC and Capital. Prudential seeks a declaratory judgment against Bank One, the FDIC, and Capital. It alleges breach of contract claims against Bank One, the FDIC, and Capital; actions for fraud/negligent misrepresentation and judicial foreclosure against Bank One, Capital, and the FDIC;[13] and claims for money had and received/unjust enrichment, quantum meruit, and tortious interference with existing contractual relations against Bank One. In its declaratory judgment action, Prudential requests that the court declare that: (a) the Lease terminated before or upon the declaration of MBank's insolvency and therefore was not properly disaffirmed by the FDIC; (b) alternatively, because of the FDIC's conduct and that of MBank, the FDIC is estopped and/or judicially estopped to deny that the Lease terminated, and/or to assert that the pledge was invalid, and/or to claim that the Lease was properly disaffirmed; (c) the pledge of the MCar Certificates was valid and enforceable, and Prudential was validly and lawfully entitled to receive and retain the proceeds from the MCar Certificates paid to Prudential by TCB; (d) Prudential is entitled to receive additional proceeds of the MCar Certificates held by TCB, as Indenture Trustee, in payment of unpaid amounts owed to it pursuant to the transaction agreements, including costs reasonably incurred by Prudential and TCB in enforcing the security interest in the MCar Certificates and MCar Proceeds; (e) Prudential is not liable to the FDIC for return of any of the MCar Proceeds that Prudential has received or for any other amounts in connection with the sale-leaseback transaction; (f) Prudential shall not be required to authorize or execute the release of any lien on or security interest in the MCar Certificates or the FF & E until it has been paid all amounts owed to it in connection with the transaction agreements; and (g) Prudential is entitled to a judgment declaring and ordering that Prudential shall retain the MCar Proceeds paid to Prudential by TCB, and that TCB shall release to Prudential MCar Proceeds in an amount sufficient to satisfy all outstanding amounts owed to Prudential in connection with the transaction agreements.
Prudential seeks alternative forms of relief in the event the pledge of the MCar Certificates is found to have been invalid, the Lease is found not to have terminated before or upon the declaration of the insolvency of MBank, the Lease is found to have been properly disaffirmed, the pledge of the MCar Assets is held to be invalid, or a combination of the foregoing occurs.
Defendant TCB brings an interpleader action by way of counterclaim against Bank One, cross-claim against Prudential, and third-party actions against Capital and the FDIC. TCB alleges that it currently holds in excess of $18 million and claims no interest in the proceeds, but that Bank One, Prudential, Capital, and the FDIC have competing claims to them. TCB seeks a discharge in interpleader.
The FDIC removed the case to this court pursuant to 12 U.S.C. § 1819. In its corporate capacity ("FDIC-Corporate") and as Receiver for MBank, the FDIC has filed a counterclaim against Prudential and TCB and a cross-claim against Capital. It seeks a declaratory judgment against Prudential, Capital, and TCB. In count IA, it asks that the court declare that MBank was prohibited by 12 U.S.C. § 91 from pledging the MCar Assets in contemplation of its insolvency, to circumvent federal banking laws, or with a view to prefer one creditor over another. In count IB, it requests a declaratory judgment that FDIC-Receiver's repudiation of the Lease was proper and that FDIC-Corporate is entitled to return of the MCar Certificates and all proceeds therefrom collected by TCB since March 28, 1989. FDIC-Corporate also *952 sues Prudential on theories of money had and received, tortious interference with contract, and constructive trust/equitable lien; sues Capital for breach of contract; sues TCB and Prudential for tortious interference with contract and civil conspiracy; and sues TCB for breach of contract, breach of fiduciary duties, breach of duty of reasonable care, and conversion.
Capital cross-claims (denominated "counterclaim") against FDIC-Corporate for a declaratory judgment regarding its rights in the transaction, requesting that the court declare that: (a) the placement of MBank into receivership on or about March 29, 1989 was an event of default under § 17(h) of the Lease; (b) upon the event of default, the Lease automatically terminated and the FF & E was repurchased by MBank at the price determined by the Casualty Value; (c) the event of default led to the acceleration of the amounts owed by Capital to Prudential on the Prudential loan; (d) the Lease terminated upon the placement of MBank into receivership on or about March 29, 1989; (e) the FDIC's purported disaffirmance of the Lease was invalid and of no effect because the Lease had already terminated upon the occurrence of the event of default; (f) TCB elected to pay the MCar Proceeds to Prudential pursuant to the terms of the Indenture, and Prudential received payment in full of the Prudential loan on or about March 15, 1990; (g) no other amounts are owed to Prudential by Capital on the Prudential loan; (h) upon payment in full of the Prudential loan, the Indenture terminated and TCB was required to make payment to Capital pursuant to the Indenture, including costs and attorney's fees incurred by Capital in attempting to enforce its security interest in the MCar Assets; (i) TCB and Prudential are required to execute and deliver releases evidencing the termination of any purported interest in the MCar Assets and the FF & E, releasing any and all purported liens on the MCar Assets and FF & E, and releasing any and all purported interest in the successor escrow account; and (j) Capital has complied with all of the terms of the transaction agreements. In the event the court declares that Capital has no right to receive payment of the remaining amounts due and owing to Capital pursuant to § 18(e) of the Lease, Capital seeks alternative declaratory relief.
Capital counterclaims against TCB for declaratory judgment,[14] tortious interference with prospective and existing contractual relationships between Capital and Bank One, negligent misrepresentation, fraud, breach of the Indenture, negligence, breach of the Escrow Agreement, breach of fiduciary duties, and breach of duties of good faith and fair dealing.
Capital counterclaims against Prudential for declaratory judgment,[15] tortious interference with prospective and existing contractual relationships between Capital and Bank One, and tortious interference with existing contractual relations between Capital and TCB.

C
Each party has moved for summary judgment. The four motions addressed in this opinion were briefed and argued on an interrelated basis and will be decided together.[16]
Capital moves for partial summary judgment in its favor and against the FDIC declaring that (a) the Ipso Facto Clause and corresponding remedy contained in § 18(e) of the Lease and § 7(b) of the Pledge Agreement are valid and enforceable; (b) the Lease terminated before or upon the declaration *953 of MBank's insolvency; (c) the FDIC's purported disaffirmance of the Lease had no effect because the Lease had already terminated; (d) Capital is entitled to receive payment of liquidated damages; and (e) unless the FDIC can demonstrate that the initial pledging of the MCar Assets and the drafting of the Ipso Facto Clause were prohibited under 12 U.S.C. §§ 91 and 194, then Capital is entitled to receive payment of liquidated damages by foreclosing on the MCar Assets.
The FDIC moves for partial summary judgment in its favor as to counts IA and IB of its actions against Capital, Prudential, and TCB, requesting that the court enter judgment declaring that (a) the Lease did not terminate upon the insolvency of MBank on or about March 28, 1989; (b) the Lease remained in force until September 13, 1989, when it was disaffirmed by FDIC-Receiver; (c) upon repudiation, no further obligations remained under the Lease to be secured by the MCar Assets; and (d) Capital, Prudential, and TCB have no rights and interests in the MCar Certificates or MCar Proceeds. Alternatively, the FDIC asks the court to declare that the Pledge purporting to transfer the MCar Certificates upon MBank's insolvency constitutes an invalid preference under 12 U.S.C. § 91.
TCB moves for partial summary judgment dismissing counts IA and IB of the FDIC's counterclaim, wherein the FDIC seeks declarations that FDIC-Receiver's repudiation of the Lease was proper and that MBank was prohibited by 12 U.S.C. § 91 from pledging the MCar Assets.
Prudential moves against the FDIC and Bank One for partial summary judgment declaring: (a) the Lease terminated before or upon the declaration of MBank's insolvency and therefore could not be disaffirmed by the FDIC; (b) the pledge of the MCar Assets was valid and enforceable, and Prudential was validly and lawfully entitled to receive and retain MCar Proceeds paid to Prudential by TCB; (c) Prudential is further entitled to receive additional MCar Proceeds held by TCB, as Indenture Trustee, in payment of unpaid amounts owed to it under the transaction agreements, including costs reasonably incurred by Prudential and TCB in enforcing the security interest in the MCar Certificates and Proceeds; (d) Prudential is not liable to the FDIC for return of any of the MCar Proceeds that Prudential has received or for any other amounts in connection with the sale-leaseback transaction; and (e) Prudential shall not be required to authorize or execute the release of any lien on or security interest in the MCar Assets or the FF & E until it has been paid all amounts owed to it in connection with the transaction agreements. Prudential also seeks alternative relief in the event the court finds that the Lease has not terminated, the Lease has been assumed by Bank One, and the obligations under the Lease remain secured by the MCar Assets, or in the event the court finds that the Lease has not terminated and has not been assumed by Bank One, the Lease has not been properly disaffirmed by the FDIC and, therefore, remains in effect and is secured by the MCar Assets.

II
The fundamental question presented by the instant motions is whether Capital and Prudential have provable claims against the MCar Assets, as required by 12 U.S.C. § 194.

A
The determination whether a creditor is entitled to recover on a claim against an insolvent national bank is governed by § 194, a proviso of the National Bank Act ("NBA"), 12 U.S.C. §§ 191-200. Section 194 provides, in pertinent part, that a receiver of a failed national bank
shall make a ratable dividend of the money so paid over to him ... on all such claims as may have been proved to his satisfaction or adjudicated in a court of competent jurisdiction.
12 U.S.C. § 194. The statute encompasses two related but distinct concepts: ratability and provability. Citizens State Bank v. FDIC, 946 F.2d 408, 413 (5th Cir.1991).
Ratable distribution requires that "dividends be declared proportionately upon the amount of all claims as they stand on the date of insolvency." American Sur. Co. v. *954 Bethlehem Nat'l Bank, 314 U.S. 314, 317, 62 S.Ct. 226, 228, 86 L.Ed. 241 (1941). Ratability obligates the court to focus on the point in time that insolvency is declared. Citizens State Bank, 946 F.2d at 413. A creditor's claim that increases after insolvency must be denied, because the claim will change the amount of the creditor's ratable share. See, e.g., White v. Knox, 111 U.S. 784, 786, 4 S.Ct. 686, 686-87, 28 L.Ed. 603 (1884) (denying claim for interest accrued post-insolvency because recognition would violate requirement of ratable distribution). The value of a claim is therefore fixed no later than the point of insolvency.
A secured creditor of an insolvent institution is entitled to collect the amount of his debt from the collateral that secures his claim, without regard to § 194's ratability requirement. See Merrill v. National Bank of Jacksonville, 173 U.S. 131, 146-47, 19 S.Ct. 360, 366-67, 43 L.Ed. 640 (1899) (NBA's requirement of equality of distribution among creditors involves no invasion of prior contract rights of such creditors and ought not be construed as having or being intended to have such result); Ticonic Nat'l Bank v. Sprague, 303 U.S. 406, 412, 58 S.Ct. 612, 614-15, 82 L.Ed. 926 (1938) (payment of interest to secured creditor from fund that constituted collateral for debt did not violate ratability requirement).[17]
Although the FDIC appears to recognize the right of secured creditors to recover against the collateral for a debt, it maintains that awarding Capital and Prudential the MCar Assets will somehow violate the FDIC's obligation to make a ratable distribution. In view of the settled jurisprudence that secured creditors are not subject to ratability to the extent their claim is collateralized, the FDIC's argument is unavailing. It is undisputed in this case that the FF & E transaction was crafted so that the MCar Assets fully secured Capital's and Prudential's claims. Accordingly, if their claims are provable, § 194 interposes no impediment to their recovering to the full extent of their respective security interests.

B
The NBA does not specify the requirements for a provable claim. Instead, Congress intended that the just and equal distribution of an insolvent bank's assets be effected "`through the operation of familiar equitable doctrines' fashioned by the courts." Citizens State Bank, 946 F.2d at 412 (quoting American Sur., 314 U.S. at 316, 62 S.Ct. at 227-28).
In Interfirst Bank Abilene, N.A. v. FDIC, 777 F.2d 1092, 1094 (5th Cir.1985), the Fifth Circuit held that "[a] claim is provable against the FDIC as receiver if (1) it exists before the bank's insolvency and does not depend on any new contractual obligations arising later; (2) liability on the claim is absolute and certain in amount when suit is filed against the receiver; and (3) the claim is made in a timely manner, well before any distribution of the assets of the receivership other than a distribution through a purchase and assumption agreement." Id. at 1094 (citing First Empire Bank-New York v. FDIC, 572 F.2d 1361, 1367-69 (9th Cir.), cert. denied, 439 U.S. 919, 99 S.Ct. 293, 58 L.Ed.2d 265 (1978)).[18]
The second and third prongs of the provability test are not at issue in the present case. The court must therefore decide only whether Capital's and Prudential's claims existed before MBank's insolvency and did not *955 depend on any new contractual obligations arising later.

1
The initial component of Interfirst Bank's first prong inquires whether Capital's and Prudential's claims existed before MBank's insolvency. This issue should not normally require more than a perfunctory analysis. Indeed, the FDIC appeared in its early briefing not to dispute that the claims existed before insolvency. At least as of oral argument, however, the FDIC argued that claims triggered by ipso facto clauses cannot exist before insolvency. The court will therefore address the question briefly.
A claim exists before insolvency when it is part, or arises out, of a contract entered into before insolvency and the terms of the contract require payment upon a specified event. This is so even if the claim does not accrue or mature until after insolvency, i.e., it is contingent on insolvency. See Citizens State Bank, 946 F.2d at 415. Thus in Citizens State Bank a standby letter of credit issued before insolvency gave rise to a provable claim even though the obligation to pay arose after the issuing bank failed. Id. at 414-15 ("The salient fact here is that Citizens' rights and claim against [the failed bank] originated from the standby letters of credit issued by [the bank] long before [its] insolvency was declared.").
In the present case the parties entered into the Lease in excess of one year prior to MBank's insolvency. The Lease provided that Capital and Prudential recover Casualty Value, a form of liquidated damages. The Lease and Pledge Agreement gave Capital and Prudential security interests in the MCar Assets. Their claims existed prior to insolvency because their rights of recovery against, and the liens upon, the MCar Assets arose pre-insolvency, even though they did not mature and accrue until the date of MBank's insolvency. See id. at 415 (when a claim is contingent and provable, "[n]othing in section 194, Merrill, or American Surety Co., requires a holding ... that [a bank's] obligation to pay a fixed amount upon the occurrence of a specific event is obviated by its insolvency predating the triggering event"). The requirement of Interfirst Bank that a claim "exist[] before the bank's insolvency," 777 F.2d at 1094, permits the harvest to occur after the bank's failure, so long as the seed of the claim germinates pre-insolvency, and the right to collect the crop post-insolvency is triggered by a specified event agreed upon prior to the bank's failure.
The requirement that a claim exist before a bank's insolvency should not typically be the subject of serious dispute between a creditor and the FDIC. At insolvency, the bank's operations cease, and the FDIC-Receiver, and thereafter a bridge bank or successor bank, takes over. A creditor's claim against the receivership estate of a failed bank is by its nature one that exists before the bank's insolvency. Otherwise, the claim would be against the successor entity itself as a result of that party's own conduct.

2
The other component of Interfirst Bank's first element  the requirement that a claim does not depend on any new contractual obligations arising after insolvency  must be the subject of a more extended analysis.
The "new contractual obligations" prohibition is derived from a line of cases in which courts have held claims for lost future rent to be unprovable when some type of post-insolvency conduct is necessary to give rise to the claim. The claim is contingent because it does not accrue on or before insolvency. The FDIC maintains that these decisions stand for the proposition that a lessor can under no circumstances recover future rents, even pursuant to an ipso facto clause. The FDIC also contends the three-prong test is inapplicable when determining the provability of a lessor's claim and claims involving lease terminations. As will be seen, the tripartite Interfirst Bank standard incorporates the holdings of the lease cases on which the FDIC relies, and is properly applied in the present case. Further, the lease decisions do not preclude claims such as those made by Capital and Prudential because their claims are not dependent upon new contractual obligations.
In Kennedy v. Boston-Continental Nat'l Bank, 84 F.2d 592, 595 (1st Cir.1936), cert. *956 dismissed, 300 U.S. 684, 57 S.Ct. 667, 81 L.Ed. 887 (1937), the First Circuit addressed whether a lessor's assignee could recover liquidated damages pursuant to a lease covenant that provided that at the lease's termination, the lessee would be liable for the excess of rent reserved, less the fair rental value. The covenant that provided for liquidated damages did not accrue until the landlord met several conditions precedent: written demand, notice, and reentry. The proviso specified that if the lessee defaulted for 30 days on rent payments or failed for 30 days and subsequently the lessor provided written notice of the default, then the lessor could reenter the premises. Upon reentry, the lease terminated and the lessee became obligated for liquidated damages. The lessee bank failed to pay rent on December 1, 1931 and was declared insolvent on December 17, 1931. Id. at 594-95. The lessor sent default notice letters to the bank on January 8, 1932. On January 13, 1932 the receiver notified the lessor of its intention not to assume the lease. On August 19, 1932 the plaintiff reentered and purported to terminate the lease. Id. at 596.
Relying on the principle that a claim must accrue on or before insolvency, the First Circuit reversed the district court's holding that the covenant in question provided for a fixed and absolutely owing liability at insolvency. Id. at 597. The lease continued in existence and, at insolvency, no damage claim for future rent existed. In order to terminate the lease and create a damage claim, the lessor was obligated to provide notice and reenter the premises. Neither condition was met until well after the bank failed. When the landlord undertook these actions, it created a new contract for indemnity. This new contractual obligation arose post-insolvency, and thus violated the requirement of ratability because no claim existed on or before insolvency. Id.
Kennedy turned on the existence of a new contract to hold the claim was not provable. This explains the panel majority's observation that upon a declaration of insolvency, a claim for liquidated damages would arise and be unconditionally due and owing "[h]ad the lease contained a covenant that insolvency shall be a breach of the lease and thereupon, without any further action by the lessor, the lease shall terminate and the lessor be entitled forthwith to damages measured, as provided in the covenant of the lease for liquidated damages."[19]Id.
In Argonaut Sav. & Loan Ass'n v. FDIC, 392 F.2d 195, 196 (9th Cir.), cert. denied, 393 U.S. 839, 89 S.Ct. 116, 21 L.Ed.2d 110 (1968), the FDIC disaffirmed an insolvent national bank's real property lease. The bank was declared insolvent on January 22, 1965. Seven months later, on July 28, 1965, the FDIC disaffirmed the lease. On December 14, 1965 the lessor's assignee sued to recover on the basis of one of three optional remedies that accrued upon appointment of a receiver. The Ninth Circuit cited Kennedy in denying future rent damages. Id. at 197. The court held that because the plaintiff did not attempt to exercise the option under the disaffirmed lease until well after the receivership, his claim did not exist upon the declaration of insolvency. Argonaut is factually similar to Kennedy in that the lessor did not purport to terminate the lease until 11 months after the bank failed, and a damage claim arose only after termination. Id. As in Kennedy, the exercise of the option to terminate gave rise to an impermissible new contractual claim. Id.
In 80 Pine, Inc. v. European Am. Bank, 424 F.Supp. 908, 909 (E.D.N.Y.1976), the plaintiff contended his right to recover, although premised on the FDIC's disaffirmance, which took place long after insolvency, related back to the declaration of insolvency. The lessee bank was declared insolvent on October 8, 1974. The relation-back argument relied on the FDIC's January 28, 1975 lease repudiation letter, which stated that termination was effective from the date the *957 FDIC took over as receiver. The court rejected plaintiff's argument. It concluded that the letter mailed four months after the bank failed could not relate back to the date of insolvency, especially because the FDIC did not possess the power to alter other creditors' rights by giving the landlord a claim that did not exist upon the declaration of insolvency. Id. at 909-10. The court held that the case fell within the rationale of Kennedy. Id. at 909.
FDIC v. Grella, 553 F.2d 258, 260 (2d Cir.1977), involved a lease of a building for a branch bank of Franklin National Bank ("Franklin"). On October 8, 1974 Franklin  the lessee  was declared insolvent and the FDIC was appointed as its receiver. Id. The FDIC entered into a P & A transaction with another bank. Franklin's lease provided the landlord with the option to terminate at any time after the tenant became bankrupt or committed an insolvent act, so long as the landlord provided five days' written notice. Six months after Franklin was placed into receivership, the landlord attempted to terminate the lease. The question presented was whether the FDIC had standing to sue for a declaratory judgment that the attempted termination was void. The FDIC sought to establish standing on the ground that it could be sued for future rentals. The Second Circuit disagreed, reasoning that "the claim of a lessor ... for excess of rents reserved over rental value upon subsequent re-entry of the landlord is not a claim that arose or became fixed until after insolvency and is unallowable against the receiver." Id. at 262 (citing Kennedy, 84 F.2d at 597).
In Executive Office Ctrs., Inc. v. FDIC, 439 F.Supp. 828 (E.D.La.1977), aff'd on the basis of the district court's opinion, 575 F.2d 879 (5th Cir.1978) (per curiam) (table),[20] a lessor sued for recovery of accelerated rent, naming as defendants the FDIC, in its capacity as receiver of a failed bank, the failed bank itself, and the successor bank that acquired certain assets and liabilities pursuant to a P & A transaction. Id. The district court held the claim was barred against the FDIC as receiver and, in turn, against the assuming bank, because the lessor's claim did not accrue and become fixed until after the failed bank was declared insolvent. Id. at 829. The lease provided that prior to the date the lessor could assert his rights under the lease, the lessee had a right to notice and to cure the default. Id. The first notice that the receiver or successor bank had that the lessor deemed the accelerated rents due was given several days after the declaration of insolvency. Id. "[A]ny claim of [the lessor] for accelerated rents could not and had not become fixed until after the [failed bank] was declared insolvent." Id. Under the lease, the condition of insolvency necessarily preceded the acceleration of the rent due. Id. Therefore, the claim for accelerated rent did not meet the requirement that it be due and owing at the time of insolvency. Id.
Dababneh v. FDIC, 971 F.2d 428 (10th Cir.1992), addressed the recoverability of future rents. The Tenth Circuit affirmed the dismissal of a plaintiff's claim for future lease payments owed by a national bank after insolvency. Id. at 432. The lessor had filed a claim for damages, based on the amount of future rents, three months after the FDIC took over the failed bank. The lessor's damages were triggered when the FDIC disaffirmed the lease. Id. at 430.
The court began its analysis with the premise that the liability of a national bank must accrue and become unconditionally fixed on or before the time it is declared insolvent. Id. at 433. The court denied the lessor's claim for future rents because the claim was triggered by the FDIC's disaffirmance after insolvency. Id. at 434. Dababneh recognized that such a claim was necessarily "contingent" because the post-insolvency disaffirmance gave rise to the claim. Id. ("[s]ince Dababneh's claim for future rent was triggered only upon the lease's disaffirmance, which followed declaration of insolvency, his claim was `contingent' upon the date of insolvency"). The court held that such a contingent claim must meet the threeprong *958 provability test set out in First Empire, 572 F.2d at 1367-69, which is the same test that the Fifth Circuit adopted in Interfirst Bank, 777 F.2d at 1094.
Dababneh concluded that unaccelerated future rents were not recoverable under the test. The court relied on Kennedy and its progeny to hold that unaccelerated rent was unprovable and that the lease at issue did not "creat[e] a `fixed amount' obligation ... justify[ing] treating this case as different from the above cited future rent cases." Dababneh, 971 F.2d at 436. Relying on the three-prong provability test and, specifically, the element precluding claims dependent on new contractual obligations, the court held that future rents accruing after the receiver terminated the lease were not provable because they violated the new contractual obligations component. Dababneh thus held that future rent claims arising after insolvency are not provable because they are dependent on new contractual obligations. Id. at 434-35.
A common analytical thread is discernible from each of these cases. A claim for future rent that is triggered by post-insolvency conduct, such as disaffirmance of a lease, a landlord's reentry and termination, or notice and a right to cure default, is not provable because the claim did not accrue on or before declaration of insolvency. Each decision examined the relevant lease clause, determined that the lease continued after insolvency, and held that the claim did not accrue on or before insolvency. The "new contractual obligations" language  originally premised on reentry alone  has been expanded to include the FDIC's disaffirmance or a lessor's option to terminate. It is nevertheless pellucid that each decision declined to recognize the claim on the basis that it did not accrue upon insolvency.
These unprovable contingent claim cases have similarities that distinguish them from the present case. On the date of insolvency, the lease in question continued in existence, and no damage claim for future rent had yet accrued. The lessors had only a claim for that particular month's rent. Sometime after insolvency, either the lessor or the FDIC terminated the lease, thereby creating a "new contractual" damage claim arising out of the termination. The decisions involve damage claims that matured after insolvency based on new contractual obligations. They have evolved to include any post-insolvency conduct, not merely reentry by the lessor, as grounds for finding new contracts. Claims that originate in new contractual obligations do not exist before insolvency; they find their origins in something done after insolvency, and thus violate the hoary rule of White v. Knox, 111 U.S. at 784, 4 S.Ct. at 686, that
[t]he business of a bank must stop when insolvency is declared.... No new debt can be made after that. The only claims that the Comptroller can recognize in the settlement of the affairs of the bank are those which are shown ... to have had their origin in something done before insolvency.
It is clear that Capital's and Prudential's claims against the MCar Assets do not depend on "any new contractual obligations" within the meaning of the first prong of Interfirst Bank. Their claims did not originate from conduct occurring after insolvency. The FF & E Lease terminated upon MBank's insolvency, obviating any need for or possibility of post-insolvency conduct. Upon the bank's failure, without option, notice, or any other action, the status of the parties was permanently fixed. At insolvency, MBank became immediately liable for any rent unpaid up to the day of insolvency, and also became obligated for the Casualty Value of the FF & E, as calculated according to the Lease and attached annexes. Section 18(e) of the Lease conferred a claim for an amount specified, which became unconditionally fixed, due, and owing, and fully accrued, simultaneously with MBank's insolvency. Capital's and Prudential's claims thus satisfy the first prong of the Interfirst provability test.

3
Two specific arguments advanced by the FDIC in opposition to the reasoning adopted by the court merit attention.
First, the FDIC maintains that the three-prong provability test of Interfirst Bank is inapplicable to a lease case, and that these *959 transactions are instead controlled by a separate common law rule precluding any claim for future rent, even one premised on an ipso facto clause. The court disagrees.
It is evident that the provability test incorporates the rationale of the lease cases. See Dababneh, 971 F.2d at 434 (language in prong one prohibiting claims dependent upon new contractual obligations "refers to a special category of cases ... which covers `provability' of future rent claims"). Cf. Citizens State Bank, 946 F.2d at 412 n. 9 (cases dealing with exercise of option to obtain liquidated damages for future rent are distinguishable from standby letter of credit cases because former turn on existence of new contract). Lease termination by an ipso facto clause would create a provable claim because it would cause the damages to accrue upon insolvency. Because no cases, including lease cases, require that a claim accrue before insolvency  but rather mandate that it accrue on or before insolvency  damage claims that accrue pursuant to ipso facto clauses fit comfortably within the usual test of provability.
The FDIC also argues that Executive Office Ctrs., 439 F.Supp. 828, stands for the proposition that a lease that purports to terminate on insolvency by its nature cannot accrue before insolvency. It urges that the provisions of the lease at issue in Executive Office Ctrs. concerning post-insolvency notice and opportunity to cure do not render the case inapposite to the present facts, because acceleration of rent occurred "at once" upon insolvency, and the notice provisions pertained solely to cure of a default, and acceleration upon insolvency could not have been cured.
The court disagrees with this reading of the case. The opinion's discussion of notice, and its emphasis of the lease provision requiring notice, 439 F.Supp. at 829, was unnecessary had the court adopted the per se rule that all claims created by acceleration or ipso facto clauses are unprovable. Yet Judge Schwartz specifically addressed the timing of the lessor's first notice, and the relevant notice evidence, in concluding "that any claim of [lessor] for accelerated rentals could not and had not become fixed until after the [failed bank] was declared insolvent." Id. In Unisys Corp. v. FDIC, 724 F.Supp. 454 (W.D.Tex.1988), Chief Judge Bunton appears to have reached a similar interpretation of Executive Office Ctrs.: "Noting that the receiver received its first notice that the rentals had been accelerated after the declaration of insolvency, the court held that the accelerated rentals could not have become fixed until after the date of insolvency, and therefore, the Plaintiff could not state a claim for the accelerated rentals against the FDIC, as receiver[.]" Id. at 458 (citing Executive Office Ctrs., 439 F.Supp. at 829). Finally, Judge Schwartz's citation to Grella, Argonaut, and 80 Pine, see Executive Office Ctrs., 439 F.Supp. at 829, all of which held that damages resulting from post-insolvency acts were inadequate to establish a provable claim, and the complete absence of any language to suggest that rights triggered at insolvency can never be provable, lend support to an interpretation that he was not adopting a per se rule that ipso facto clauses cannot create claims that meet the test of provability; instead, he reached a result consistent with several other decisions that had denied contingent future rent claims because the particular facts made the claims unprovable.

C
The foregoing discussion reflects that the provability test has thus far been applied to three different types of claims. The first classification is denominated non-contingent provable. This type of claim is non-contingent because it accrues prior to insolvency. Interfirst Bank, 777 F.2d at 1094, provides the most apposite example. There the Fifth Circuit permitted a creditor bank to offset damages arising from breach of contract and fraud claims against the account of a failed bank. The damage claim arose from loan participation agreements entered into between Interfirst and the failed bank. The agreements absolved the failed bank of liability for damages unless harm resulted from fraud. Prior to insolvency, and as early as entry into the participation agreements, the failed bank committed numerous fraudulent acts resulting in harm to Interfirst. In upholding *960 the offset, the Fifth Circuit adopted the three-prong provability test that this court applies today, and noted that the claim clearly accrued pre-insolvency. Id.
Contingent provable claims constitute the second category. These claims are contingent because they do not "accrue" on or before insolvency, but instead mature upon a post-insolvency event. They are deemed provable because the obligation to pay upon a specific event originates prior to insolvency and does not rely upon a new contractual obligation. As the panel explained in Citizens State Bank, when a claim is contingent and provable,
nothing in section 194, Merrill, or American Surety Co., requires a holding ... that [a bank's] obligation to pay a fixed amount upon the occurrence of a specific event is obviated by its insolvency pre-dating the triggering event[.]
Citizens State Bank, 946 F.2d at 415. Thus in Citizens State Bank the Fifth Circuit, applying the provability test, found standby letters of credit provable because they existed before insolvency and, unlike the lease cases thus far decided, did not depend on any new contractual obligations. The claim accrued when the underlying debt went into default and the holder of the letters of credit presented them to the failed bank.
Finally, the third type of claim is contingent unprovable. In Dababneh, 971 F.2d 428, a contingent future rent claim was deemed to be unprovable because it was a claim for future rent that did not arise on or before insolvency.
Essentially, through careful planning, Capital and Prudential crafted provable claims against the MCar Assets. The claims do not run afoul of § 194's requirement of ratability because they were fully secured. They also meet the test of provability. The claims did not originate from any conduct occurring after MBank's insolvency and, unlike contingent unprovable lease cases and even contingent provable standby letter of credit cases, accrued upon insolvency without further action, notice, reentry, or subsequent termination. The claims thus did not depend on any new contractual obligations arising after insolvency, and otherwise comported with the provability test of Interfirst Bank. Therefore, if the FDIC is successfully to abrogate the FF & E transaction and Capital's and Prudential's rights to the MCar Assets, it must do so on some basis other than § 194.

III
The FDIC argues in the alternative that if Capital's and Prudential's claims are provable within the meaning of § 194, they nevertheless constitute preferences that are voidable pursuant to 12 U.S.C. § 91.[21]

A
"Section 91 prohibits the transfer of assets after the commission of an act of insolvency or in contemplation thereof, made `with a view to the preference of one creditor to another.'" Senior Unsecured Creditors' Comm. v. FDIC, 749 F.Supp. 758, 774 (N.D.Tex.1990). In order to set aside the transaction as a preference, the FDIC must prove: (1) a transfer, assignment, or payment prescribed in § 91; (2) that the transfer occurred after an act of insolvency or in contemplation of insolvency; and (3) that the transfer was made either to prevent application of the bank's assets in the manner provided by the NBA or with the intent of preferring one creditor over another. Kullman & Co. v. Woolley, 83 F.2d 129, 132 (5th Cir.1936). While the FDIC may show that the transfer occurred either after an act of insolvency or in contemplation of insolvency, it must also establish either that the transfer was made to avoid the requirements of the NBA or to prefer one creditor over another. FDIC v. Goldberg, 906 F.2d 1087, 1092-93 *961 (5th Cir.1990).[22]

B
The first prong of the preference analysis, in this case a transfer or payment of money, is not in dispute.

C
The second component requires the FDIC to establish that the transfer occurred after an act, or in contemplation, of insolvency. The FDIC contends a transfer occurred after an act of insolvency, and thus violates § 91, because the liquidated damages arose at insolvency. The court disagrees.
The summary judgment record discloses that MBank pledged the MCar Certificates in December 1987 and restated its pledge in February 1988. It also provided additional MCar Certificates in June, October, and December 1988 to cover the diminished value of the certificates. The court holds that the transfer, for the purpose of determining the relevant time period, occurred no later than February 1988, when MBank consummated the transaction involving Capital, Prudential, and TCB, and executed the Pledge Agreement. See Burrowes v. Nimocks, 35 F.2d 152, 155 (4th Cir.1929) (physical transfer after insolvency of assets pledged prior to insolvency, and not in contemplation thereof, related back to pledge and therefore not void pursuant to 12 U.S.C. § 91). When MBank became insolvent, Capital's and Prudential's rights to proceed against the MCar Assets were triggered automatically, and related back to the initial security agreement.[23] The court holds that no transfer or payment occurred after an act of insolvency.[24]
The FDIC argues in the alternative that a fact issue precludes summary judgment because the transaction was undertaken while MBank was in contemplation of insolvency. For purposes of § 91, a bank acts in contemplation of insolvency when "the fact becomes reasonably apparent to its officers that the concern will presently be unable to meet its obligations, and will be obliged to suspend its ordinary operations." Goldberg, 906 F.2d at 1091 (quoting Kullman, 83 F.2d *962 at 132). According to the FDIC, if MBank's officers "knew or ought to have known, that at the time of the transfers the suspension of the regular business of the bank was imminent, the transfers were made in contemplation of insolvency." Id. (quoting Bender v. Etnier, 26 F.Supp. 484, 487 (M.D.Pa.1939)).
The FDIC is both the summary judgment movant (with respect to its request that the court enter judgment on count IA of its counterclaim, declaring that MBank was prohibited by § 91 from pledging the MCar Assets in contemplation of insolvency) and summary judgment nonmovant (with regard to all the claims of Capital and Prudential that contend the pledge of the MCar Assets was valid and enforceable and that they are entitled to recover the proceeds of the certificates). The FDIC will have the burden of proof at trial regarding the preference question. See Goldberg, 906 F.2d at 1092. In order for the FDIC as movant to obtain summary judgment on a matter as to which it has the burden of proof, it must establish "beyond peradventure all of the essential elements of the claim or defense." Fontenot v. Upjohn Co., 780 F.2d 1190, 1194 (5th Cir. 1986). By contrast, in order for Capital and Prudential to be entitled to summary judgment on the preference issue, they may carry their burden by pointing out to the court that there is an absence of evidence to support the FDIC's assertion of a preference. See Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553-54, 91 L.Ed.2d 265 (1986). Once they satisfy this burden, the FDIC is then obligated to adduce specific facts showing a genuine issue for trial. Id. at 324, 106 S.Ct. at 2553; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). An issue of fact is genuine if the evidence supporting its resolution in favor of the party opposing summary judgment, together with any inference in that party's favor that the evidence allows, would be sufficient to support a verdict in the party's favor. Hilton v. Southwestern Bell Tel. Co., 936 F.2d 823, 827 (5th Cir.1991) (per curiam), cert. denied, 502 U.S. 1048, 112 S.Ct. 913, 116 L.Ed.2d 813 (1992). An issue of fact is not genuine if no reasonable trier of fact could find in favor of the nonmovant. Lavespere v. Niagara Mach. & Tool Works, Inc., 910 F.2d 167, 178 (5th Cir.1990). Accordingly, the evidence produced by the nonmovant must have significant probative value. See Anderson, 477 U.S. at 249-50, 106 S.Ct. at 2510-11.
Capital and Prudential have pointed the court to the absence of evidence that the transfer was made in contemplation of insolvency. They have cited to specific proof, in the form of deposition testimony from MBank's chief financial officer and other officers, that MBank officers did not believe MBank would presently become insolvent. They have also identified documents in which MBank officials certified that the Pledge was not made in contemplation of insolvency. The FDIC has provided no direct proof to refute the prima facie evidence that MBank's officials did not anticipate imminent insolvency. It has failed to present a genuine dispute regarding the subjective knowledge of MBank officials.
The FDIC also seeks to avoid summary judgment on the basis of evidence that other lenders would not finance the transaction because it was perceived as too risky based on MBank's financial condition. It relies on the fact that Prudential itself recognized that the transaction posed risks, and therefore required security. The FDIC also cites proof that MBank's condition over time especially after February 1988was worsening, and that the Pledge itself shows that MBank was in financial trouble. This evidence, which appears to relate to what MBank's officers should reasonably have known, is insufficient to raise a genuine issue of material fact. MBank officials have testified and certified that they did not contemplate imminent insolvency. The mental state of Prudential's officers, and of the personnel of other companies, does not create a fact question concerning the actual or constructive knowledge of MBank's officers. See Kullman, 83 F.2d at 132 (creditor's knowledge is not the relevant inquiry in determining existence of preference); Goldberg, 906 F.2d at 1092 n. 13 (bank officer's knowledge should be the focus of court's inquiry because bank's knowledge at time of transaction is the relevant conduct).
*963 Moreover, MBank did not actually commit acts of insolvency for over a year after the transaction. The cases require imminent or present insolvency. Given the facts of this case, no reasonable trier of fact could find that in February 1988 MBank officials knew or reasonably should have known that MBank would fail over one year later.[25]
The FDIC also submits that a fact issue exists regarding the June, October, and December 1988 pledges of additional MCar Certificates. It maintains that these pledges were in contemplation of insolvency because MBank's deteriorating financial condition would objectively have alerted a reasonable officer of imminent insolvency even if the MBank officers subjectively did not believe that the bank would fail.[26] The court disagrees with the FDIC's position. As part of the original arrangement, MBank was required to pledge additional certificates because the nature of the collateral was such that the MCar Certificates diminished in value as the underlying notes were paid off.[27] These subsequent pledges were also necessary to prevent default on the Lease. Section 17(k) of the Lease required the lessee to maintain the collateral in the amount necessary to satisfy the Pledge Agreement. Given that the Lease and Pledge Agreement explicitly required MBank to maintain the collateral at the original level, no reasonable trier of fact could find that these replenishments were made in contemplation of insolvency, despite MBank's deteriorating financial condition. Cf. Burrowes, 35 F.2d at 155 (transfer was required by original pledge and, although physical transfer actually occurred when bank was in contemplation of insolvency, because it was required by agreement made when bank was not in contemplation of insolvency, the transfer related back to the original pledge).
The FDIC has not presented a genuine issue of material fact concerning the second prong of the preference test. Its contention that the claims violate 12 U.S.C. § 91 must be rejected.[28]

IV
A predominant position taken by the FDIC in support of its motion for partial summary judgment, and in opposition to the motions filed by Capital, Prudential, and TCB, is the contention that under the common law and for public policy reasons, the FDIC has the power to marshal the assets of a failed bank for ratable distribution to its bona fide creditors and, in so doing, to repudiate burdensome leases and to disregard ipso facto clauses as unenforceable. The FDIC maintains that private parties cannot contractually avoid or penalize the exercise of the FDIC's repudiation power or create a provable claim against the FDIC-Receiver or the assets of a failed bank. The FDIC therefore contends the Lease must have continued in effect after MBank's insolvency; that the FDIC properly repudiated the Lease; and that because, as of the date of repudiation, all rental payments had been timely made, all claims against MBank and, in turn, Capital's and Prudential's claims against the MCar Assets, were extinguished.

*964 A
The court considers first the FDIC's contention that its common law authority to marshal assets empowered it to abrogate the sale-leaseback transaction. The court holds that the cases on which the FDIC relies to support this argument, NCNB Tex. Nat'l Bank v. Cowden, 895 F.2d 1488 (5th Cir. 1990); and FDIC v. Bank of Boulder, 911 F.2d 1466 (10th Cir.1990) (en banc), cert. denied, 499 U.S. 904, 111 S.Ct. 1103, 113 L.Ed.2d 213 (1991), are distinguishable, and their reasoning does not support the FDIC's position.
In Cowden the Fifth Circuit held that an asset of a failed bank was transferable despite a state law that restricted transferability. Cowden, 895 F.2d at 1499. The court addressed whether certain trust appointments were transferable. The failed bank had been named trustee for numerous trust instruments, but state law provided that a trusteeship was non-transferable unless the trust said otherwise. The panel determined the trust appointments were an asset of the failed bank and that, pursuant to the Federal Deposit Insurance Act ("FDIA"), 12 U.S.C. §§ 1811-1832, the asset was transferable notwithstanding state law. Because the FDIA explicitly permitted the transfer of all assets, and the state law interfered with the FDIA, federal law preempted the contrary state statute. Id. at 1501.
In Bank of Boulder the Tenth Circuit held that assets of a bank could be transferred pursuant to a P & A agreement, including assets not transferable under state law, because a federal statute permitted the transfer. 911 F.2d at 1472-73. The FDIC, in its corporate capacity, purchased letters of credit from the FDIC, as receiver, that were generally nonassignable. The court held the state law was preempted to the extent it precluded transfer. Id. at 1473.
The present case is distinguishable. In both Cowden and Bank of Boulder the courts addressed restrictions on the transfer of what indisputably were assets of the receivership estate. An asset must belong to a bank to be subject to marshaling. Fidelity & Deposit Company of Maryland v. Conner, 973 F.2d 1236, 1243 (5th Cir.1992). Under the common law, however, property that secures a valid lien that was not granted after or in contemplation of insolvency removes the pledged property from the bank's asset pool until the property satisfies the pledge. Scott v. Armstrong, 146 U.S. 499, 510, 13 S.Ct. 148, 151, 36 L.Ed. 1059 (1892). Insolvency does not abrogate security interests and liens. Id.; cf. First Empire, 572 F.2d at 1366, 1370-71 (FDIC's right to marshal assets did not supersede provable claim). The property is not an asset subject to marshaling because the secured creditor is entitled to recover against it to satisfy the debt the collateral secures. Cowden and Bank of Boulder dealt with assets owned by the bank, unencumbered by liens, but not transferable under applicable state law. The MCar Assets were validly pledged, were not a preferential transfer, and, by operation of the FF & E Lease and other transactional documents, were removed (to the extent of Capital's and Prudential's lien interests) from the MBank asset pool. They were not assets of MBank to be marshaled. Cf. Ticonic, 303 U.S. at 413, 58 S.Ct. at 615 ("The statutory lien prior to insolvency withdrew the pledged security from the assets of the bank available to general creditors insofar as might be necessary to satisfy the lien. Though title to the collateral was in the name of the bank it was subject to the lien and to that extent the property pledged could not properly be said to belong to the creditors.").
The FDIC's power to marshal assets does not of itself include the authority to transmute into assets property that is not otherwise included in the receivership estate. Because the FDIC's argument, if accepted, would permit it in the name of marshaling assets to compromise the right of secured creditors, and thereby upset settled jurisprudence concerning provability and ratable distribution, its position must be rejected.

B
The FDIC also contends the transaction violates public policy because MBank "bargained away" the FDIC's repudiation rights. Essentially, the FDIC argues that because it has a common law right to disaffirm *965 burdensome obligations, see, e.g., Grella, 553 F.2d at 262, in order for it to exercise this power, a lease must remain in effect after insolvency.
To see the fallacies in the FDIC's analysis, it is important to reduce the argument to its essence. The FDIC is attempting to transform its recognized power to disaffirm burdensome leases that remain in effect after insolvency into a right to abrogate any transaction that it deems burdensome to the receivership estate or to the FDIC insurance fund. This necessarily includes the authority to disregard an ipso facto clause, because such a proviso has the effect of terminating a lease before the FDIC has the right to disaffirm it. Stated another way, the FDIC seeks to keep an agreement alive, notwithstanding that it ended by its own terms at insolvency, merely for the purpose of repudiating the agreement. The problem with this inventive approach is that no pre-FIRREA statutory or common law supports the proposition that ipso facto clauses are per se void or voidable in the context of national bank failures. The FDIC may not broadly invoke its power to disaffirm burdensome leases in order to revive completed transactions for the sole purpose of killing them.
This is not to say that the FDIC is always powerless to abrogate an otherwise valid ipso facto clause. There are instances in which considerations of public policy permit the FDIC to do so. Because the exception is narrow, public policy must be applied only in limited instances, and on a case-by-case basis. The court must therefore examine the specific facts of the present case to determine whether policy justifications will permit the FDIC to prevail. It is obligated to analyze the effect of the FF & E Lease transaction on the MBank receivership estate and the FDIC's capacity to perform its intended functions.
The courts have frequently recognized the vital role played by the FDIC's ability to enter into P & A transactions. See Texas American Bancshares v. Clarke, 954 F.2d 329, 333 (5th Cir.1992); Senior Unsecured Creditors' Comm., 749 F.Supp. at 767. This court would likewise view favorably the FDIC's attempts to repudiate transactions that compromise its efforts to carry out the other significant powers conferred upon it by Congress. Cf. Sweet Jan Joint Venture v. FDIC, 809 F.Supp. 1253, 1257 (N.D.Tex.1992) ("Congress conferred broad powers upon [the Federal Savings and Loan Association] to carry out its functions, which were vital to the national economy."). In the present case, however, the FDIC has not demonstrated that upholding the FF & E transaction has any material effect on the MBank receivership, or upon the FDIC's ability to enter into a P & A agreement or carry out its statutory mission.
This is not a case in which an ipso facto clause in a lease effected a loss of a leasehold of the bank's premises, thus preventing a bridge bank or successor institution from opening its doors for business. The Lease did not bar the use of furniture and equipment that was essential to a successor bank's functions. Indeed, the opposite is true. The transaction was structured so that MBank and, in turn, the FDIC-Receiver and any successor bank obtained complete and unfettered ownership and use of the FF & E. In other words, but for the loss of the MCar Assets  a circumstance to which the court will turn below  the FF & E Lease was drafted so that when the FDIC took over as receiver, it obtained all the FF & E located on the failed bank's premises as if there had been no sale-leaseback transaction, and was able to convey it to the bridge bank. The FDIC is hard-pressed to argue for abrogation under these circumstances.
The present case stands in stark contrast to the decisions on which the FDIC relies, in which courts have invalidated ipso facto clauses.
In Smith v. Hoboken R.R. Warehouse & S.S. Connecting Co., 328 U.S. 123, 133, 66 S.Ct. 947, 953, 90 L.Ed. 1123 (1946), the Supreme Court declined to enforce an ipso facto clause that terminated a ground lease upon which the insolvent railroad's tracks were laid. Without the lease, the railroad would have forfeited its business and been unable to reorganize. Id. at 132, 66 S.Ct. at 952-53. This result would have undermined the Interstate Commerce Act, id. at 130, 66 *966 S.Ct. at 951, and could not be upheld. Id. at 133, 66 S.Ct. at 953.
In In re Fontainebleau Hotel Corp., 515 F.2d 913, 916 (5th Cir.1975), the Fifth Circuit affirmed the bankruptcy court's decision not to enforce an ipso facto clause that would have resulted in the debtor's losing its only income-generating property. The effect of the clause would have made reorganization of the debtor impossible because it would have caused the hotel to revert to the lessor upon insolvency. Id.
Finally, the court in In re Queens Blvd. Wine & Liquor Corp., 503 F.2d 202, 207 (2d Cir.1974), declined to enforce an otherwise valid clause because it deprived the debtor of an asset "absolutely necessary to its continued viability."
Nor has the FDIC demonstrated that the Lease had any material impact on its capacity to marshal MBank's remaining assets or to enter into the P & A Agreement. Indeed, it would appear that the transaction enabled the FDIC-Receiver to guarantee DIBB/ Bank One that the bank would have furniture, fixtures, and equipment  not to mention a door to the bank vault  thus significantly facilitating the FDIC's efforts swiftly to effect a P & A transaction.
The FDIC counters this rationale, however, on the basis of a perceived need to hold all available assets in place until the FDIC can review them and determine whether assumption or repudiation would be beneficial. It urges that the Ipso Facto Clause of the Lease deprived it of this option and forced the failed MBank to purchase FF & E that the FDIC-Receiver did not want or need. This reasoning is unpersuasive. No "snapshot" rule is required because the FDIC, in unique circumstances, can disaffirm a transaction on the basis of public policy, notwithstanding an ipso facto clause. And if the FDIC possesses no right of disaffirmance in a particular case, it matters not that the FDIC is unable to hold in place an asset that it cannot in any event recapture for the receivership estate.
In the final analysis, this litigation can be reduced to a dispute over money  a loss of several million dollars from the receivership estate. But the FDIC's desire to replenish its insurance fund with the MCar Assets is not of itself sufficient to entitle it to exercise its considerable powers. Cf. O'Melveny & Myers v. FDIC, ___ U.S. ___, ___, 114 S.Ct. 2048, 2055, 129 L.Ed.2d 67 (1994) ("[T]here is no federal policy that the fund should always win. Our cases have previously rejected `more money' arguments remarkably similar to the one made here." (citations omitted)).[29] In limited circumstances, public policy can preclude the enforcement of otherwise valid contracts. Fidelity & Deposit Co. v. Conner, 973 F.2d 1236, 1241 (5th Cir.1992). This rule is "to be applied cautiously and only in plain cases involving dominant public interests." Id. The policy must be rooted in "`the laws and legal precedents not from general consideration of supposed public interests.'" Id. (quoting Muschany v. United States, 324 U.S. 49, 66, 65 S.Ct. 442, 451, 89 L.Ed. 744 (1945)). The fact that a transaction entered into pre-insolvency will burden, or reduce the worth of, a receivership estate is simply "but one aspect of the grim reality that faces the FDIC upon the failure of a financial institution." Irving Indep. Sch. Dist. v. Packard Props., Ltd., 762 F.Supp. 699, 703 (N.D.Tex. 1991), aff'd, 970 F.2d 58 (5th Cir.1992). The loss of the MCar Proceeds, while of significance in an abstract sense, has not been shown in the present case to be material in the context of the failure of a bank that, at insolvency, had in excess of $1 billion in overnight loans from the Federal Reserve Bank of Dallas. This is inadequate to warrant nullifying provable, non-preferential secured claims against MBank.

V
The FDIC next submits that, if the court concludes that Capital's and Prudential's rights were triggered by acts of insolvency, the liquidated damages provision that entitled *967 them to recover Casualty Value from the MCar Assets is an unenforceable penalty. Because the court is deciding these motions on the basis of the OCC's declaration of MBank's insolvency, it need not decide whether the liquidated damages clause is an impermissible penalty in the context of acts of insolvency. Nevertheless, since the FDIC has asserted the argument throughout the briefing and raised it at oral argument, the court will address it.
The parties do not dispute that Texas law governs this issue.[30] Under Texas law, in order for a liquidated damages clause to be enforceable, it must meet a two-prong test: (1) the harm caused by a breach of the agreement in question must be incapable or difficult of estimation; and (2) the amount of liquidated damages called for must be a reasonable forecast of the amount necessary to render just compensation. See Phillips v. Phillips, 820 S.W.2d 785, 788 (Tex.1991) (quoting Rio Grande Valley Sugar Growers, Inc. v. Campesi, 592 S.W.2d 340, 342 n. 2 (Tex.1979)). The party seeking to avoid a liquidated damages clause has the burden of proving it is a penalty. See Advance Tank & Constr. Co. v. City of DeSoto, 737 F.Supp. 383, 384 (N.D.Tex.1990) (Sanders, C.J.).
The FDIC maintains that the liquidated damages provision violates the first prong because the parties could easily have estimated the anticipated harm by providing for accelerated rents.[31] The court disagrees. Under Texas law, a landlord is obligated to mitigate his damages. Thus a simple acceleration of future rents may not be a proper measure. See Southwest Park Outpatient Surgery Ltd. v. Chandler Leasing Div., 572 S.W.2d 53, 56-57 (Tex.Civ.App.1978, no writ) (simple acceleration of rents without crediting lessee for resale or re-letting of property violates just compensation and is void as penalty). Instead, the landlord is required to subtract the resale or re-letting value from the future rentals reduced to present value. Id. at 57.
The FF & E consists of furniture, carpeting, vaults, security, and electrical systems. In similar cases, Texas courts have recognized that it is difficult to estimate the harm flowing from a breached lease involving permanently-affixed property. See, e.g., Blakeway v. National Credit Corp., 439 S.W.2d 155, 158-59 (Tex.Civ.App.1969, writ ref'd n.r.e.). When this value is difficult to estimate, the courts uphold liquidated damages as an estimation of actual harm. Id. at 157. The present case is no different. The parties perceived at the time the transaction was consummated that valuation of a breach would be difficult. A sizable portion of the FF & E could not be removed. Under these facts, the harm caused by the breach was not easily calibrated, whether by future rents or some other measure. Prudential, Capital, and MBank therefore provided for liquidated damages upon certain defaults. The measure of damages was based on the cost of the property reduced by the rental payments, thus reflecting that the amount of damages was decreased by periodic payments. The FDIC has not proffered evidence sufficient to present a genuine issue of fact whether Capital's or Prudential's harm was easily calculable at the time the parties entered into the transaction. Nor has it adduced evidence that raises a fact issue whether the amount of liquidated damages was unreasonable. The court therefore holds as a matter of law that the liquidated damages provision is not a penalty.[32]

*968 VI
The motions addressed by this opinion are decided as follows. The court grants the motions for partial summary judgment of Capital, Prudential, and TCB and denies the motion for partial summary judgment of the FDIC. The court declares that the Ipso Facto Clause contained in § 17(h) of the Lease, the corresponding remedy contained in § 18(e) of the Lease, and § 7(b) of the Pledge Agreement are valid and enforceable; that the Lease terminated as of the OCC's declaration that MBank was insolvent; that the FDIC lacks the authority and power under the circumstances presented by this case to disaffirm the Lease; that the pledge of the MCar Certificates was valid and enforceable; that Capital and Prudential are entitled to recover liquidated damages, calculated according to the Lease, from the MCar Assets and to retain such damages to the extent they do not exceed the amount due them; and that Prudential is not liable to the FDIC to return any of the MCar Assets that Prudential has received, to the extent the MCar Assets do not exceed that to which Prudential is entitled under the transactional documents. The court dismisses with prejudice counts IA and IB of the FDIC's counterclaim.
SO ORDERED.
NOTES
[1] Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub.L. No. 101-73, 1989 U.S.C.C.A.N. (103 Stat.) 183.

The motions decided today are resolved on the basis of pre-FIRREA law. Although the Federal Deposit Insurance Corporation ("FDIC") argued in its earliest briefs that FIRREA should be applied retroactively, in its last brief  under the heading "FDIC is not seeking to apply FIRREA retroactively"  and at oral argument, the FDIC urged that FIRREA does no more than codify prior law and therefore no retroactivity question is presented. The FDIC appears to concede that if FIRREA represents a change from prior law, the Supreme Court's analysis in Landgraf v. USI Film Prods., ___ U.S. ___, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994), precludes retroactive application. The court will therefore decide the instant motions on the basis of pre-FIRREA law.
Were the court to decide the retroactivity question, it would hold that FIRREA changes the law that controls the issues decided today, and that it should not be applied retrospectively, in the absence of clear Congressional intent, to abrogate rights that had become completely vested and had been fully exercised several months prior to FIRREA's enactment. See id. at ___, 114 S.Ct. at 1500-01. The court does not suggest, however, that FIRREA is inapplicable to other aspects of this case. That question should be decided only in the relevant context.
[2] Capital is also a third-party counterplaintiff.
[3] For clarity, in the balance of this opinion the court will refer to MBank as if it were the only lessee, and will refer to MCorp only as the context requires.
[4] Prudential is also a counterplaintiff, third-party plaintiff, and third-party counterdefendant.
[5] TCB is also a counterplaintiff, third-party plaintiff, and third-party counterdefendant.
[6] The parties also amended the Lease several months later. Because this iteration is not pertinent to today's decision, the court will refer only to the February 1988 Lease in this opinion.
[7] Section 18(e):

Notwithstanding anything else in this Lease to the contrary, upon and simultaneously with the occurrence of an Event of Default described in Section 17(h), the following remedy shall be the exclusive remedy available to the Lessor, and any pre-existing or subsequent remedies otherwise applicable under the terms of this Lease shall be of no effect, and the Lessor shall, without notice, demand, or any other action whatsoever on the part of Lessor, automatically be deemed to have elected the following exclusive remedy simultaneously with the occurrence of such Event of Default: This Lease shall absolutely cease and terminate and be of no further force or effect but the Lessee shall remain liable as hereinafter provided; and thereupon the Lessee shall, without further demand, notice or other action whatsoever on the part of Lessor, forthwith pay to the Lessor an amount equal to any unpaid Rent due and payable for all periods up to and including the Basic Rent Date following the date on which this Lease is in default, plus, as liquidated damages for the loss of a bargain and not as a penalty, an amount equal to the aggregate Casualty Value of the Leased Equipment, computed as of the date of the Event of Default under Section 17(h). Immediately upon receipt of such payment, the Lessor shall execute and deliver to the Lessee, or to the Lessee's Assignee, nominee, or legal representative, a bill of sale (without representations or warranties except that the Leased Equipment is free and clear of all Liens arising by, through or in the right of Lessor or by or in favor of any Person claiming by, through or under the Lessor and that the Lessee shall receive all right, title and interest in the Leased Equipment as originally transferred by Lessee to Lessor pursuant to this Lease) for the Leased Equipment, and such other documents as may be required to release the security interest in the Leased Equipment or any other interest held by any Assignee or nominee in such form as may be reasonably requested by Lessee, all at the Lessee's expense. The Lessor shall simultaneously, automatically and without demand, notice or any further action whatsoever on the part of Lessor have the rights under the Pledge Agreement in order to ensure collection of the amounts set forth in the immediately preceding sentence. It is the understanding and intent of the parties that upon the occurrence of an Event of Default described in Section 17(h), this Section 18(e) shall create and there shall arise, simultaneously with such Event of Default, an accrued and unconditionally fixed claim in the amount as set forth in the first sentence of this Section 18(e).
[8] The term "Casualty Value" was defined in Annex B to the Lease. It consisted of the property's cost, multiplied by a factor set out in the schedule. The multiplying factor declined over time as MBank made payments. The declining multiplier reflected that the lease payments reduced the cost of the property as Prudential and Capital recovered their costs through periodic payments. (The formula was slightly different if the contract was terminated early.)
[9] Section 7(b) states, in relevant part:

Notwithstanding anything else in this Pledge Agreement to the contrary, upon the occurrence of a Default described in Section 17(h) of the Lease the following remedy shall be the exclusive remedy available to the Pledgee, and any pre-existing or subsequent remedies otherwise applicable under the terms of this Pledge Agreement shall be of no effect, and the Pledgee shall, without notice, automatically be deemed to have elected the following exhaustive remedy simultaneously with the occurrence of such Default and without any action required by the Pledgee: without any notice, Pledgee may sell to a third party or to itself for its own account the Pledged Collateral in accordance with Section 7(c) or retain the Pledged Collateral and the proceeds of such sale or retention shall be applied in satisfaction of the Lessee's obligation pursuant to Section 18(e) of the Lease in the event of an insolvency of MBank Dallas, N.A.
[10] It is unclear whether the declaration of insolvency occurred during the late hours of March 28 or the early hours of March 29. The court need not resolve this question.
[11] The FDIC is also a third-party counterplaintiff. The FDIC is litigating this action in its capacity as receiver for MBank ("FDIC-Receiver") and in its corporate capacity ("FDIC-Corporate"). The court will refer to the FDIC without designating its particular capacity unless the context otherwise requires.
[12] Plaintiff Bank One is also a counterdefendant. When DIBB changed its name to Bank One, Banc One Corporation began to manage the bank, but the stock of the institution was owned by the FDIC. Banc One Corporation, through a wholly-owned subsidiary, purchased a percentage of Bank One's equity in 1990 and as of October 1991 owned 100% of Bank One.
[13] In an August 24, 1994 opinion, the court dismissed Prudential's claim against the FDIC for judicial foreclosure.
[14] Capital's declaratory judgment action against TCB requests relief identical to all items except one of its declaratory judgment action against FDIC-Corporate.
[15] Capital's declaratory judgment action against Prudential seeks identical relief to that sought against FDIC-Corporate.
[16] In this opinion, the court decides parts or all of four of the six pending motions. A motion to strike, and objections to summary judgment evidence, have also been filed. These are denied as moot.

In separate orders filed today, the court denies without prejudice Bank One's motion for partial summary judgment against Prudential and TCB, the portion of Prudential's motion directed against Bank One, and TCB's motion for partial summary judgment against Capital.
[17] TCB contends, on the basis of Ticonic, that a secured creditor need not meet the provability requirement. The court disagrees. Ticonic rests on concepts of ratability, not provability. A secured creditor may recover more than an unsecured creditor, but he must have a provable claim. Moreover, any portion of an undersecured creditor's debt that is not collateralized is subject to the requirement of ratability.
[18] The FDIC maintains that the Interfirst Bank test is inapplicable in the case of a lease entered into by a national bank. It argues that a common law rule, derived from Kennedy v. Boston-Continental Nat'l Bank, 84 F.2d 592 (1st Cir. 1936), cert. dismissed, 300 U.S. 684, 57 S.Ct. 667, 81 L.Ed. 887 (1937), and its progeny, controls the FF & E transaction. As the court explains below, the test adopted by the Fifth Circuit in Interfirst Bank incorporates the Kennedy line of cases. The court rejects the FDIC's contention that a different provability test applies.
[19] The FDIC argues that Kennedy was addressing bankruptcy law in this respect. The court disagrees. Although the panel stated in this passage that a claim would arise and "be provable in bankruptcy," and drew from bankruptcy cases as precedent, its decision was made in the context of the NBA. See, e.g., Argonaut Sav. & Loan Ass'n v. FDIC, 392 F.2d 195, 197 (9th Cir.) (construing Kennedy as authority interpreting § 194), cert. denied, 393 U.S. 839, 89 S.Ct. 116, 21 L.Ed.2d 110 (1968).
[20] The per curiam affirmance of the Fifth Circuit is reported in a table at 575 F.2d 879. The panel opinion states in full: "We affirm the judgment below on the basis of Judge Schwartz's opinion, E.D.La., 1977, 439 F.Supp. 828. AFFIRMED."
[21] 12 U.S.C. § 91 provides, in relevant part:

All transfers of notes, bonds, bills ... all deposits ... for [the national bank's] use; or for the use of any of its ... creditors; and all payments of money either made after the commission of an act of insolvency or in contemplation thereof, made with a view to prevent the application of its assets in the manner prescribed by this chapter or with a view to the preference of one creditor to another ... shall be utterly null and void....
[22] The Goldberg panel recognized that a movant may satisfy the intent requirement when the first two prongs are met and the effect of the transaction creates a preference. 906 F.2d at 1092. This is so because a person is held to intend the natural and probable consequences of his action. Id. Under Goldberg a party must still establish a transfer after an act of insolvency or in contemplation of insolvency. If either condition is met, and the effect of the transaction creates a preference in favor of one creditor over another, then the intent element found in prong three may be presumed. Id. at 1093. The reverse is not true. If one creditor receives more than another, it may not be presumed that it was done in contemplation of insolvency. Thus the fact that Prudential and Capital may receive more than other creditors does not of itself create a voidable preference.
[23] This construction of the concept of transfer is in harmony with cases that hold that liens either expressly or statutorily created prior to insolvency, but not in contemplation thereof, are not rendered void pursuant to § 91. See, e.g., Fidelity & Deposit Co. v. Howard, 67 F.2d 961, 964 (5th Cir.1933) (lien arising before insolvency, based on statutory requirement, is not a preference), aff'd sub nom. Lewis v. Fidelity & Deposit Co., 292 U.S. 559, 54 S.Ct. 848, 78 L.Ed. 1425 (1934); Scott v. Armstrong, 146 U.S. 499, 510, 13 S.Ct. 148, 151, 36 L.Ed. 1059 (1892) (liens arising prior to insolvency, and not in contemplation thereof, are not invalidated under § 91). The FDIC contends that Prudential and Capital received preferential treatment through their security arrangement. Although a secured creditor may receive preferential treatment in that he recovers more than an unsecured or undersecured creditor, the foresight to require collateral does not transform a transaction into a preference. "The provisions of the [NBA] are not directed against all liens, securities, pledges or equities whereby one creditor may obtain a greater preference than another, but against those given or arising after or in contemplation of insolvency." Scott, 146 U.S. at 510, 13 S.Ct. at 151; see also Ticonic, 303 U.S. at 412, 58 S.Ct. at 614-15 ("[T]o the extent that one debt is secured and another is not there is manifestly an inequality of rights between the secured and unsecured creditors which cannot be affected by the principle of equality of distribution." (citations omitted)).
[24] That a transfer of assets is considered at the time of the pledge is also well-established in bankruptcy law. See In re Compton Corp., 831 F.2d 586, 590-91 (5th Cir.1987) (in secured transaction, transfer for purpose of determining preference occurs when security interest is granted, not when secured party attempts to enforce security agreement).
[25] Cf. Stapylton v. Stockton, 91 F. 326, 330 (5th Cir.1899) (bank's need to borrow money should not be sufficient to suggest that bank is in contemplation of insolvency).
[26] The last replenishment occurred in December 1988, three months prior to the OCC's declaration of insolvency.
[27] This has also been recognized in bankruptcy law regarding preferences and floating liens. See In re Compton, 831 F.2d at 590-91 (property transferred as required by original pledge but within preference period held not to be a preference because it related back to original pledge).
[28] Because the test is conjunctive, the FDIC's inability to present a genuine issue of material fact concerning the second prong renders immaterial any factual questions concerning the third component  that the transfer was made either to prevent application of the bank's assets in the manner provided by the NBA or with the intent of preferring one creditor over another. See Celotex, 477 U.S. at 323, 106 S.Ct. at 2552-53 (complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial; therefore, there can be no genuine issue of material fact).

Capital and Prudential also argue that the transaction meets a "new value" exception to preferences. The court need not reach this issue.
[29] The court's reliance on O'Melveny & Myers is not inconsistent with its decision in RTC v. Sands, 863 F.Supp. 365 (N.D.Tex.1994). In Sands the court declined to apply O'Melveny & Myers on the basis that it did not alter Fifth Circuit precedent that remained binding on this court. Id. at 368-372. No such precedent controls in the instant case.
[30] In an early brief, the FDIC maintained that FIRREA precluded liquidated damages claims. Because the court is considering claims governed by pre-FIRREA law, it will not address FIRREA's impact on this analysis.
[31] It is not entirely clear whether the FDIC is suggesting the Lease should have provided for the acceleration of future rents as the measure of damages rather than the measure the parties opted to use. Regardless, this contention does not address whether the harm caused was easily calculable. Accelerated future rents are not a measure of actual harm, but are instead a form of liquidated damages. Blakeway v. National Credit Corp., 439 S.W.2d 155, 157 (Tex.Civ.App. 1969, writ ref'd n.r.e.).
[32] The court has declined to address the FDIC's contention that if Capital's and Prudential's rights arose from MBank's acts of insolvency, the liquidated damages provision is an unenforceable penalty. Even were the court to reach the argument, it would reject it. The FDIC argues that the provision is unenforceable because it violates the rule against imposing liquidated damages for multiple defaults of differing degrees of severity. See Servisco v. Tramco, Inc., 568 S.W.2d 434, 437 (Tex.Civ.App.1978, writ ref'd n.r.e.). In Servisco the court held that if several matters of differing degree of importance all give rise to the same liquidated damages, then the contract is an unenforceable penalty because the clause violates the "just compensation" requirement. Id. In the present case, only two conditions could have triggered the liquidated damages: acts of insolvency or a declaration of insolvency. Numerous other less severe remedies were prescribed for other less significant breaches under the contract. The FDIC maintains that because any number of unspecified events could amount to acts of insolvency, the provision violates Servisco. The court disagrees. Any occurrence that amounts to an act of insolvency is necessarily of equal severity. Thus any commission of an act of insolvency is a significant breach under the contract. Simply because any number of events could be classified as an act of insolvency does not render the provision void under Servisco's rationale.